Howard T. Hogan, J.
This is a proceeding to review the tax assessments of a number of tax lots which collectively are popularly known as the Roosevelt Field Shopping Center. It was tried before me during the period from November 19, 1962 to March 21,1963, and subsequently was reopened to admit evidence of a sale of the property which was consummated on June 10, 1963. The periods covered are the tax years of 1957-58, through 1962-63. Each tax year ran from May 1 to April 30.
The property lies in the Town of Hempstead, its westerly portion being in the Incorporated Village of Garden City. It is bounded on the north by Old Country Road, on the east by Meadowbrook Parkway, on the south by Stewart Avenue and on the west by Clinton Road. Its area, originally 166 acres, was reduced by 1962 to approximately 106 acres.
As a result of sales and new construction the make-up of the Center varied from year to year, and the tax lot designations varied accordingly. The improvements included not only a large number of retail stores and restaurants, but also office buildings, a skating rink, parking areas, a bus terminal, an extensive road system, various malls, fountains, artificial ponds, *679 kiosks, an underground service tunnel by which merchandise and supplies were trucked to and from the individual stores, and underground service areas and offices.
A large department store was constructed on land purchased from this petitioner before 1957, and is being operated by B. H. Macy. Another was erected at the northerly end but was- sold while under construction and is being operated by Grimbels. Both share in the use of the Center’s parking areas, underground tunnel and other facilities. It is conceded that they exercise a beneficial effect upon the petitioner’s remaining property insofar as they attract large numbers of customers who tend to patronize the smaller shops; the restaurants and the food markets which, standing alone, would not draw them into the area. It is this circumstance which makes the operation a regional, as distinguished from a neighborhood, shopping center.
At the outset, so that the parties may better follow the court’s treatment of the problems which arise from changes in the tax lots and the status of improvements on the six taxable status dates, it sets forth the following table, compiled from the public records of the County Assessors:

For the Tax Year of May 1,1957 to April SO, 1958

(All lots in Sec. 44, Block A)

Assessed

Tax Lot Area Improvements Valuation

26A 108.48 acres Buildings B, C, D, B, F, G, H, J, K, L, N, 0, P, as designated on Pet’s Ex. 2-A; Franklin Natl. Bank under construction L —$1,995,543 B —82,852,657 T —$4,848,200
26B 50.55 acres Recharge Basin, Roadways L —$ 344,080 B— 0 T —$ 344,080
107 1,421 acres Road to Stewart Ave. L —$ 9,290 B— 0 T —$ 9,290
317 5.686 acres Road to Stewart Ave. L —$ 37,140 B— 0 T —$ 37,140

For the Tax Year of May 1,1958 to April 80,1959

260 (former L.26A less Franklin Bank) 101.48 acres Buildings B, C, D, E, F, G, H, J, K, L, N & P, Socony Gas Station, Richards Restaurant, Skating Rink & building L —$1,852,325 B —$2,763,825 T —$4,616,150
26B 50.55 acres Prudential Building L —$ 357,895 B —$ 28,555 T —$ 386,450
107 Same as in 1957-58
317 Same as in 1957-58

*680
For the Tax Year of May 1,1969 to April SO, 1960

Assessed

Tax Lot Area Improvements Valuation

26D (for-99.112 acres Buildings B, C, D, E, F, G, H, J, K, Lmer L.26G L, N, & P, Skating Rink & Building Bless Rich-Tards & Socony) $1,782,216 $2,717,334 $4,499,550
26B 50.55 acres Prudential Building LBT- $ 357,895 $ 28,555 $ 386,450
107 Same as in 1957-58 and 1958-59
317 Same as in 1957-58 and 1958-59

For the Tax Year of May 1, 1960 to April SO, 1961

26D Same as in 1959-60
26B Same as in 1959-60
107 Same as in 1959-60
317 Same as in 1959-60

For the Tax Year of May 1, 1961 to April SO, 1969

26F (for-95.504 acres Buildings B, O, D, E, F, G, H, J, K, Lmer L.26D L, N, & P B less SkatTing Rink & Gimbel prop. 26E (for-50.015 acres None L mer L.26B B less PrudT ential Bldg. $1,388,216 $2,672,474 $4,060,690 $ 333,745 0 $ 333,745
107 Same as in 1960-61
317 Same as in 1960-61
283 1.594 acres Skating Rink L B T — $ 173,840 — $ 44,860 — $ 218,700
285 2.0217 acres None L B T — $ 220,160 — 0 — $ 220,160

For the Tax Year of May 1, 1969 to April SO, 196S

26F 95.504 acres Buildings B, C, D, E, F, G, H, J, K, L L, N, & P — Century Theatre (under B const.) T — $1,752,988 — $2,720,362 — $4,473,350
283 1.5946 acres Skating Rink L B T — $ 173,840 — $ 44,860 — $ 218,700
285 2.022 acres Gimbel (under const.) L B T — $ 220,160 — $ 499,990 — $ 720,150

*681
Tax Lot Area Improvements Assessed Valuation

292 5.6193 acres Sump L —$ 35,115 B — 0 T —$ 35,115
296 4,36 acres None L —$ 28,500 B — 0 T —$ 28,500
As might be expected, this operation did not realize its full potential in the six years following its opening, nor has its progress toward that goal been uniform. Three other regional centers, Green Acres in Valley Stream, Mid-Island Shopping Plaza in Hicltsville and Walt Whitman Shopping Center in Huntington, as well as an ever-increasing number of neighborhood centers compete with it, with a result that, judging by its high vacancy factor, the operation appears, at least at this time, to have been overbuilt. While this condition may be remedied by the steady population growth in the area, the appraisal of the property for tax purposes must be based primarily upon existing' conditions rather than hopeful expectations.
Of the various approaches to this particular problem of evaluation, the court finds that only two, reproduction cost less depreciation, and capitalization of income, are here practical. Although there was introduced some evidence of the sale of Cross County Shopping Center in White Plains and of Walt Whitman Shopping Center in Huntington, the complete details were not available. The court is well aware that such transactions usually are so complex and are based upon so many conditions and contingencies, that only the most detailed analysis might reveal the true consideration.
Proof of this is found in the sale of the subject property on June 10, 1963. When the proceeding was reopened to permit evidence of this the court was presented with copies of the closing instruments and a detailed 72-page analysis of them. Included in this sale price of $21,000,000, was not only the subject premises but eight other parcels. It was made subject to numerous leasehold interests and to several substantial easements. The purchaser, U. S. Steel & Carnegie Pension Fund, immediately leased all of the land to a third party, and sold to this third party all of the improvements then on the land, taking back a substantial purchase-money leasehold mortgage. This third party then gave the petitioner herein, the original owner, a long-term operating lease. The purchaser then assigned the aforesaid purchase-money mortgage to this petitioner-seller, as part of the $21,000,000 purchase price. The third party thus *682 became the tenant under the ground lease, the landlord-owner under the operating lease, and the mortgagor under the leasehold mortgage of which this petitioner was the assignee.
Payment of this purchase-money mortgage is made contingent upon the net operating income earned by the mortgagee! If this income falls below a fixed minimum, payment of the mortgage will be forgiven!
This is by no means a complete summary of the transaction but it should serve to indicate the futility of using this, or probably the sale of any other regional shopping center, for the purpose of arriving at fair valuation for tax purposes.
In circumstances not unlike these, also involving a sale leaseback, the Appellate Division recently held that: ‘1 Under such circumstances, neither the sale price nor the rent from the seller which was required to be applied in reduction of a purchase-money mortgage of over 90% of the sale price, is indicative of the fair value of the property sold or rented; such factors reflect financial considerations which may be totally unrelated to the worth of the property. (Matter of Montague Assoc. v. Boyland, 19 A D 2d 742.)
Turning first to the economic approach to valuation, the court finds that it may be used only as to the tax lot which has been designated as No. 26A in 1957-58, 260 in 1958-59, 26D in 1959-60 and 1960-61, and 26F in 1961-62 and 1962-63, for the reason that on this lot have been located those stores, offices, restaurants, etc., which, throughout the proceeding have been designated “the shopping center,” and that these alone were productive of virtually all the rental income received by the petitioner.
The other lots, so far as the court is informed, produced little if any direct income, and were either sold or remained vacant throughout the years in question. They must be valued by a different method.
Unfortunately, the income and expense figures of “ the shopping center ” are open to serious question, first, because of the abnormal percentage of unrented space, and, second, because the expenses have not been satisfactorily broken down between “ the shopping center ” and the other tax lots. Headings such as “ Repairs and Maintenance,” “Advertising and Promotion,” “ Heat, Light and Power ” appear to cover all the property under review. Claim even has been made that properties of the petitioner, other than the subject properties, are involved in these financial statements.
*683 The problem is further complicated by the obvious fact that “ the shopping center” so far has failed to realize its full potential. Even respondent’s witness Adelsberg has commented on this. At page 105 of his appraisal he states that ■“ a large shopping center does not acquire its full and mature value when it opens its doors. A period of years is normally required for development and promotion to attract trade to a new area, for the new stores to discover and establish the requisite merchandising techniques for the particular area and clientele, and for errors, flaws or ‘ bugs ’ to be discovered and corrected. During this promotion period, the center has not yet proven itself and, in fact, has no history of earnings to form a sound basis for valuation.
“ Thus, for these early years, even though the improvements are adequate and new — and even though normally adequate improvements when new do and should add their full physical value to the land — I do not consider that they add their full physical value to the land and have valued them accordingly.” (Italics supplied.)
This shopping center opened its doors in 1956 with many vacant stores. Some of the buildings under construction never produced income, but were sold upon, or prior to, completion, e.g., the Franklin National Bank, Grimbels and the Prudential Building. Even today, after seven years of operation, building “ N,” with space for 11 tenants, is entirely vacant, and two large areas in the southeast corner, opposite Macy’s Department Store, likewise, are unoccupied. According to respondent’s own witness, at one time more than one third of the rentable space was vacant.
This vacancy factor cannot be completely reflected in the assessed valuation, but it must be given some weight.
The court has considered the petitioner’s annual income and expense statements covering its entire operation and the estimate of respondent’s witness Adelsberg as to what the income and the expense items should have been. It has assumed that all the income was derived from “ the shopping center,” in the form of rents and contributions by tenants toward maintenance and taxes, under the terms of their leases. It has then made a rough approximation of the real estate taxes payable only on the tax lot encompassing “ the shopping center.” This was complicated by the fact that the town tax is computed on the calendar year and the school tax on a fiscal year beginning July 1, while petitioner’s profit and loss statements run from May 1 to April 30 of each year. Next, it made what it considered an appropriate allocation of a portion of the of *684 the net income for each of the tax years in question as follows:

1957-58

Reported Income from all sources... $1,361,731.76
Expenses:
Taxes....................................... $240,000.00
Repairs, Maintenance and Operating............ 350,000.00
Insurance.................................... 48.000. 00
Management and Leasing...................... 31.000. 00
Advertising and Promotion..................... 70.000. 00
Heat, Light and Power........................ 79.000. 00 818,000.00
Net Income...................... $543,731.76

1958-59

Reported Income from all sources... $1,585,577.35
Expenses:
Taxes....................................... $360,000.00
Repairs, Maintenance and Operating............ 350,000.00
Insurance.................................... 48.000. 00
Management and Leasing...................... 47.000. 00
Advertising and Promotion..................... 70.000. 00
Heat, Light and Power........................ 80.000. 00 955,000.00
Net Income..................... $630,577.35

1959-60

Reported Income from all sources... $1,468,430.20
Expenses:
Taxes....................................... $375,000.00
Repairs, Maintenance and Operating............ 350,000.00
Insurance.................................... 48.000. 00
Management and Leasing...................... 60.000. 00
Advertising and Promotion..................... 70.000. 00
Heat, Light and Power........................ 60.000. 00 963,000.00
Net Income..................... $505,430.00

1960-61

Reported Income for all sources____ $1,408,809.60
Expenses:
Taxes....................................... $375,000.00
Repairs, Maintenance and Operating............ 350,000.00
Insurance.................................... 50.000. 00
Management and Leasing...................... 60.000. 00
Advertising and Promotion..................... 70.000. 00
Heat, Light and Power........................ 70.000. 00 975,000.00
Net Income..................... $433,809.60

*685
1961-62

Reported Income from all sources............................... $1,499,446.47
Expenses:
Taxes....................................... $370,000.00
Repairs, Maintenance and Operating............ 325,000.00
Insurance.................................... 50,000.00
Management and Leasing...................... 52,000.00
Advertising and Promotion..................... 70,000.00
Heat, Light and Power........................ 70,000.00 937,000.00
Net Income $562,446.47

1962-63

(Petitioner’s statement runs from May 1, 1962 to November 30, 1962)
Projected Income from all sources............................... $1,478,682.00
Projected Expenses:
Taxes....................................... $380,000.00
Repairs, Maintenance and Operating............ 325,000.00
Insurance.................................... 50,000.00
Management and Leasing...................... 52,000.00
Advertising and Promotion..................... 50,000.00
Heat, Light and Power........................ 60,000.00
927,000.00
Projected Net Income......................................... $551,682.00
In spite of various methods of capitalizing income suggested by the witnesses, the court believes that the most practical formula in arriving at a fair value for tax assessment purposes, as distinguished from the price that an investment purchaser primarily in search of income might pay at a particular time, is the application of a single flat rate to the net income. In view of the current money rates, the risk of a continued high vacancy percentage, and the complexity of managing an operation which, to protect income, requires the determination of averages due from tenants, as well as the collection of proportionate contributions from tenants and others for the maintenance of the various facilities used in common, the court finds that an investor would demand a return of no less than 9% on the purchase price.
When this rate is applied, the following values result for ‘ ‘ the shopping center ” alone:
1957- 58......................... $6,041,500
1958- 59......................... 7,006,400
1959- 60......................... 5,616,000
1960- 61......................... 4,820,000
1961- 62.......................... 6,250,000
1962- 63.......................... 6,130,000
*686 Turning finally to the determination of the cost of reconstructing this property, the court finds the only instance in this proceeding when there is an approach to agreement between any of the expert witnesses is upon the appraisal of the. basic land value. Summarized, their findings are as follows:

Edwards (for Petitioner) Matthews (for Respondents)

1957- 58.................. $5,920,800 $6,855,100
1958- 59.................. 6,167,800 6,640,500
1959- 60 ................. 6,660,490 7,310,200
1960- 61.................. 7,442,100 8,036,800
1961- 62...... 7,913,720 9,303,400
1962- 63 .................. 6,404,240 8,074,800
It should be noted that both these witnesses are eminently qualified, with a combined experience of more than 80 years appraising land in Nassau County. The court disagrees with each only in certain minor respects. Both ascribe no value to Lot 292 for the year 1962 because it consists of a sump or recharge basin. The court views this as an integral part of the shopping complex. It disposes of the surface drainage from the roads and parking areas and without it the Center could not operate. Hence, it is indispensible to the present and future production of income. The respondents Assessors apparently agree with the court, since they have assessed this 5.5-acre tax lot at $35,115 for 1962, the year it was first carved out of tax lot 26E. (The ratio of assessed valuation to full value has been stipulated by the parties for the purposes of this proceeding to be .3588.)
The court disagrees also with the values of $732,000 and $410,000 which Matthews places on Lot 283 for the years 1961-62 and 1962-63, respectively. This consists of 1.594 acres, upon which the skating rink and skate house have been built. A unit value of approximately $250,000 per acre seems completely unrealistic, particularly in view of the low net yield from the skating operation. The respondents themselves placed an assessed valuation of $173,840 on it for both years, indicating a full value of approximately $484,000 for the land alone, or a unit value of $302,500 per acre.
It also disagrees with the values of $528,400 and $634,000, which the same witness places on Lot 285 for the years 1961-62 and 1962-63, respectively. This is a two-acre plot upon which, at that time, Grimbels Department Store was in the course of constructing. It would seem equitable that only after the building was completed and the improved land was producing income, should it be given a value and subjected to a tax burden com *687 mensúrate with such income. During the period of construction, the value of the improvement was computed only upon the stage of completion on the tax status dates, and the fair cost of such partial construction could be the only proper measure. However, this witness (and the Assessors) would appear to have anticipated the amount which the land would eventually contribute to the earnings of the completed operation. While the value of these two acres had been greatly increased merely by the development of the rest of the shopping center around them, they were hardly worth a total of $613,600, the value indicated by the assessment of $220,160, or the amount fixed by this witness, before the improvement was completed.
The sales price of this two-acre parcel to Gimbels furnishes no help in determining its value. Respondents’ witness Adelsberg, describing the “ Gimbel Transaction,” said at page 57 of his appraisal that on February 23, 1961, the petitioner gave Gimbels title to what is now tax Lot 285, 11 title to the construction costs already incurred and other payments, constituting in all a payment of $1,500,000. Gimbels in turn agreed to erect the department store building * * * (the $1,500,000 thus paid by R. F. Inc. has been set upon its books as a deferred charge — Deferred Inducement Costs — ).”
This appears to confirm the court’s finding that shopping center sales data is of doubtful, if any, use in valuating such operations for tax assessment purposes.
Based upon the appraisals of the witnesses Edwards and Matthews, the evidence of acreage sales in the area, the unique location of the subject property and the court’s observation of the advantages arising from both its size and its availability to the shopping public, the court finds the following values of the land in all the tax lots:

Year Area Fair Value (rounded)

1957- 58......................... 166.137 =•= acres $6,200,000
1958- 59.......................... 159.137 “ 6,300,000
1959- 60.......................... 156.769 “ 6,700,000
1960- 61.......................... 156.769 “ 7,500,000
1961- 62.......................... 156.241 “ 8,000,000
1962- 63.......................... 109.099 “ 7,000,000
It appears to the court that since these parcels were in single ownership, it would have been logical to place them in a single tax lot. Certainly it would have greatly simplified the work of the witnesses and the court. However, the power to designate them on the Tax Map of the county lies solely with the Board of Assessors. Even though they might have exercised this *688 power in an arbitrary manner, no timely objection has been raised. Accordingly, the court must allocate to the land in each tax lot that portion of the value of the whole which it deems proper. In the absence of any compelling reason for a different distribution, the court will apportion it in the same ratio as the individual tax lot land assessments bear to the assessment of petitioner’s total land, wherever practical. It is unable to follow this method for the years 1961-62 and 1962-63 because it considers the assessed valuation of Lots 283 and 285 disproportionate and excessive in these years.
The results are tabulated as follows:

1957-58

Total land assessment — $2,386,053 Full Value Found — $6,200,000

Lot No. Land A. V. Ratio to entire Assessment Full Value

26A................... $1,995,543 .836 $5,183,200
26 B................... 344,080 .144 892,800
107.................... 9,290 .004 24,800
317.................... 37,140 . 016 99,200

1958-59

Total land assessment — $2,256,650 Full Value Found — $6,300,000

Lot No. Land A. V. Ratio to entire Assessment Full Value

26C................... $1,852,325 .821 $5,172,300
26B................... 357,895 .158 995,400
107.................... 9,290 .004 25,200
317.................... 37,140 .017 107,100

1959-60

Total land assessment — $2,186,541 Full Value Found — $6,700,000
26D................... $1,782,216 . 815 $5,460,500
26B................... 357,895 .164 1,098,800
107................... 9,290 .004 26,800
317.................... 37,140 .017 113,900

1960- 61

Total land assessment — $2,186,541 Full Value Found — $7,500,000
26D................... $1,782,216 . 815 $6,112,500
26B................... 357,895 .164 1,230,000
107.................”... 9,290 .004 30,000
317.................... 37,140 . 017 127,500

1961- 62

Full Value Found — $8,000,000
26F............................. $6,000,000
26E.....!....................... .... 1,400,000
107.............................. .... 42,500
317’’"'...i...................... .... 153,000
283.............................. .... 200,000
285.............................. .... 200,000

*689
1962-68

Lot No. Full Value Found — $7,000,000
26F.......................... $6,100,000
283........................... .......... 200,000
285........................... .......... 200,000
292........................... 119,000
296........................... 98,000
The proof of the value of the improvements revealed wide differences among the experts. Petitioner’s witness, Jacks, estimated only the landlord’s cost of erecting the basic store buildings, because in many instances substantial items such as store fronts, lighting fixtures, air conditioners and ceilings had to be installed by the tenants in the stores. He ignored the fact that for the purposes of this proceeding these items should have been included, since they were included in the assessments under attack. Proof of the value of these additions is not in evidence.
He did, however, base his estimate directly upon the original plans and specifications from which the basic structures were built, and in the absence of proof to the contrary, the court has accepted his testimony as to the type and quantity of the materials used. He stated that the cost of basic construction was $5.75 per square foot, and he computed the area involved to be 961,988 square feet, making the total cost approximately $5,200,000. The cost of a completed building, he testified, should be no more than $10 per square foot.
His sound value for all improvements is summarized as follows:
May 1, 1957...................... $5,298,240
May. 1, 1958...................... 5,305,150
May 1, 1959...................... 5,520,200
May 1, 1960...................... 5,454,960
May 1,1961...................... 5,318,110
May 1, 1962...................... 5,288,350
It is difficult to see how these unit prices could be applied to the tunnel, the malls and other miscellaneous improvements. This, together with the fact that he did not consider the structural additions made to the stores by the tenants, limits the value of his appraisal.
Respondents’ building expert, Brady, did not base his estimate on the plans and specifications, but from visual inspection. This method is inexact and subject to possibly substantial errors as to the type and quantities of material actually used. Witness included in his appraisal certain improvements which, by reason *690 of prior sale or by the dates of their construction, appear not to have been taxable to the petitioner. Eliminating these as far as possible, his estimates seem to the court to be as follows:
As of May 1, 1957 Sound Value
Lot 26A Buildings B, C, D, E, F, G, H, J, K, L, N, O, P, Tunnel, Malls,
etc.................................................. $11,476,660
Franklin National Bank Bldg. Under Construction......... 2,764,300
$14,240,960
As of May 1,1958
Lot 26C Buildings B, C, D, E, F, G, H, J, K, L, N & P, Socony Station, Bichard’s Restaurant, Skating Rink, Tunnel, Malls, etc.................................................. $11,614,996
Lot 26B Prudential Building (should have been treated as under construction) ............................................ 124,321
$11,739,317
As of May 1,1959
Lot 26D Buildings B, C, D, E, F, G, H, J, K, L, N & P, Tunnel, Malls, etc., Skating Rink.................................... $11,599,840
Lot 26B Prudential Building (completed).......................... 121,835
$11,721,675
As of May 1,1960
Lot 26D Same as 1959........................ $11,609,194
Lot 26B Prudential Building................... 121,835
$11,731,029
As of May 1,1961
Lot 26F Buildings B, C, D, E, F, G, H, J, K, L, N & P, Tunnel, Malls, etc.................................................. $11,282,055
Lot 283 Skating Rink.......................................... 204,787
' $11,486,842
As of May 1, 1962 Sound Value
Lot 26F Same as in 1961 (Witness failed to include Century Theatre under construction)................................... $11,249,602
Lot 283 Skating Rink.......................................... 199,856
Lot 285 Gimbels (under construction)............................ 4,111,819
$15,561,277
The principal improvements on the tax lot which is designated No. 26A in 1957, 26C in 1958, 26D in 1959 and 1960, and 26P in 1961 and 1962 are the retail stores and restaurants. They are grouped in 10 building units; The basic construction is extremely simple and purely functional. The exterior basement walls are of concrete. All other walls and interior partitions are ,of masonry block. The roofs are of coated gypsum slabs. The structural additions ma^e by the tenants are, in *691 most cases, the usual store fronts, lighting fixtures, etc. Although the court could not give a great deal of weight to the total appraisals of either witness, it finds that the unit cost of Jacks, so far as it was applied, was realistic. Using this as a base and considering that a number of the buildings had been completed by tenants, with store fronts, lighting fixtures and air conditioning, while others had remained wholly or partially unrented, and consequently uncompleted during the years at issue, and determining that the steady increase in labor and material costs offset the annual rate of depreciation, and that economic obsolescence is not yet observable, it arrives at the following finding of reconstruction cost less depreciation:

1957-58

Lot No. Land Improvements Total

26 A........... ...... $5,183,200 $8,500,000* $13,683,200
26B........... ...... 892,800 0 892,800
107........... ...... 24,800 0 24,800
317............ ...... 99,200 0 99,200
$14,700,000
* Includes $1,500,000 for Franklin National Bank under construction.

1958-59

26C........... ...... $5,172,300 $7,190,000* $12,362,300
26B.......... ...... 995,400 70,000 1,065,400
107........... ...... 25,200 0 25,200
317........... ...... 107,100 0 107,100
$13,560,000
* Includes $40,000 for gasoline station, $50,000 for Richard’s Restaurant, $100,000 for skating rink.

1959-80

26D.............. $5,460,500 $7,100,000* $12,560,500
26B.............. 1,098,800 70,000 1,168,800
107............... 26,800 0 26,800
317............... 113,900 0 113,900
$13,870,000
* Includes $100,000 for skating rink.

1980-81

26D.............. $6,112,500 $7,100,000* $13,212,500
26B.............. 1,230,000 70,000 1,300,000
107............... 30,000 0 30,000
317............... 127,500 0 127,500
$14,670,000

*692
1961-62

No. Lot Land Improvements Total

26F.......... ...... $6,000,000 $7,000,000 $13,000,000
26E........... ...... 1,400,000 0 1,400,000
107............ ...... 42,500 0 42,500
317........... ...... 153,000 0 153,000
283........... ...... 200,000 100,000 300,000
285........... ...... 200,000 0 200,000
$15,095,500

1962-63

26F........... ...... $6,100,000 $7,075,000* $13,175,000
283............ ...... 200,000 100,000 300,000
285............ ...... 200,000 l,400,000† 1,600,000
292............ ...... 119,000 0 119,000
296............ ...... 98,000 0 98,000
$15,292,000
(In the absence of convincing proof to the contrary, the court has accepted the appraisals which respondents’ witness Adelsberg has made of the Century Theatre and the respondents’ Assessors’ appraisal of Cimbel’s Department Store, both under construction, as of May 1,1962, the tax status date.)
The reconstruction or replacement cost is the upper limit beyond which properties ordinarily may not be assessed. (People ex rel. Lehigh Val. Ry. Co. v. Harris, 168 Misc. 685, affd., 257 App. Div. 912, affd. 281 N. Y. 786.) Upon the unsatisfactory proof in the record as to the economic or capitalized value of these properties, however, this court must, of necessity, accord such reconstruction or replacement cost substantial weight. It should be offset by the indisputable fact that the properties have been unable to achieve a stabilized income commensurate with their cost, due possibly to over-building and to the many concessions which the petitioner made to induce R. H. Macy to locate in the Center.
These concessions are contained in an “ operating Agreement ” dated July 15,1955. Section 7.2 of this Agreement provides (p. 28): “ (E) No retail store in the Roosevelt Field Shopping Center having a floor area in excess of 5,000 square feet shall be occupied or used as a single retail store unless the occupant or user shall have first been approved by Macy as provided in the last paragraph of this section.” Further restrictions upon the use of the land surrounding “ the shopping center ” are set forth elsewhere in the Agreement.
*693 In time, with the continuing population growth, this situation may improve, but during the years in question the value of the petitioner’s property was unquestionably depressed by these circumstances. Giving what it considers the proper weight to this factor, the court finds that its effect on “ the shopping center ” was to lower its fair value by at least 10%, but that it did not affect the remainder of petitioner’s property which was, in general, productive of no direct income.
Accordingly, it makes the following findings:

1957-58

Land Improvement Total

Lot No. Actual 85.88% Actual 85.88% Actual 85.88%

26A $4,664,880 $1,673,760 $7,650,000 $2,744,800 $12,314,900 $4,418,600 26B 892,800 320,336 0 0 892,800 320,300 107 24,800 8,900 0 0 24,800 8,900 317 99,200 35,592 0 0 99,200 35,600
$13,331,700 $4,783,400

1958-59

26G $4,655,000 $1,670,214 $6,471,000 $2,321,795 $11,126,070 $3,992,000
26B 995,400 357,149 70,000 25,116 1,065,400 382,000
107 25,200 9,042 0 0 25,200 9,000
317 107,100 38,427 0 0 107,100 38,400
$12,323,770 $4,421,400

1959-60

26D $4,914,500 $1,763,322 $6,390,000 $2,292,732 $11,304,500 $4,056,000
26B 1,098,800 394,249 70,000 25,116 1,168,800 419,300
107 26,800 9,615 0 0 26,800 9,600
317 113,900 40,867 0 0 113,900 40,900
$12,614,000 $4,525,800

1960-61

26D $5,501,250 $1,973,848 $6,390,000 $2,292,732 $11,891,250 $4,266,600
26B 1,230,000 441,324 70,000 25,116 1,300,000 466,400
107 30,000 10,764 0 0 30,000 10,800
317 127,500 45,747 0 0 127,500 45,700
$13,348,750 $4,789,500

1961-69

26F $5,400,000 $1,937,520 $6,300,000 $2,250,440 $11,700,000 $4,188,000
26B 1,400,000 502,320 0 0 1,400,000 502,300
107 42,500 15,249 0 0 42,000 15,200
317 153,000 54,896 0 0 153,000 54,900
283 200,000 71,760 100,000 35,880 300,000 107,600
285 200,000 71,760 0 0 200,000 71,800
$13,795,000 $4,939,800

*694
1962-63

Land Improvement Total

Lot No. Actual 85.88% Actual 35.88% Actual 35.88%

26F $5,490,000 $1,969,812 $6,367,500 $2,284,659 $11,857,500 $4,254,500
283 200,000 71,760 100,000 35,880 300,000 107,600
285 200,000 71,760 1,400,000 502,320 1,600,000 574,100
292 119,000 42,697 0 0 119,000 42,700
296 98,000 35,162 0 0 98,000 35,200
$13,974,500 $5,014,100

 Includes $100,000 for skating rink.

 Includes Century Theatre under construction at $100,000.

 Gimbel’s Department Store under construction.