HowapuD T. Hogan, J.
In this consolidated tax certiorari proceeding the court is again confronted with the question of valuing part of a large, well known regional shopping center.
In an earlier case (Matter of Roosevelt Field, Inc., v. Podeyn, 47 Misc 2d 677), the court found full values ranging from $12,300,000 in 1958-1959 to $13,900,000 in 1962-1963. The present proceeding involves only a portion of the tax lots that constitute the entire shopping center. The years now under review are 1966 through 1970, both inclusive, and the relevant tax status dates are May 1, 1965, through May 1, 1969.
[Material omitted as not of sufficient interest.]
Each of the lots under review is utilized in a different manner. Lot 1421 (295 in later years) consists of access roads over which petitioner has easements. Lot 292 is a sump, 283 a skating rink and 26 K (26 N in later years) a major portion of the center itself.
Petitioner has utilized the income approach to value as its main theory, and the actual income figures are not in dispute and generally coincide with fair market rental. The principal areas of disagreement involve the vacancy factor to be used and the economic effect of leases made several years prior to the period in question.
Petitioner’s experts utilized primarily the rentals in effect upon the property as fair market rental notwithstanding the fact that they had, in many cases, been entered into several years prior to the first year under review. Respondent’s expert found that many of the leases did not contain tax escalation and common area maintenance provisions usual in modern leases.
[Material omitted as not of sufficient interest.]
In a tax certiorari proceeding, the court is required to value property as it existed on the tax status date. The maximum value for real estate taxation purposes is the reproduction cost of the structure less its accrued depreciation added to the value of the land (People ex. rel. Manhattan Sq. Beresford v. Sexton, 284 N. Y. 145).
Respondent’s building expert found sound values in each of the years in question for the two improved lots.
[Material omitted as not of sufficient interest.]
*185 Petitioner did not produce a building expert, choosing instead to rely upon the economic approach to value. On cross-examination it was admitted that the enclosure of the mall was probably not completed on the tax status date in 1969, and evidence was introduced showing that the mall was only 62.9% completed at tax status date. This requires a deduction of $536,000 for the building estimate of that year. Considerable time was also spent in examining respondent’s treatment of fixtures depreciation approach which was at the rate of 2% per year and which was related solely to physical depreciation and not functional or economic obsolescence.
The court finds from the bulk of the testimony that there is substantial functional obsolescence. However, there is no way to. estimate the degree of such factor in valuing the physical structure. This concept of obsolescence will be considered by the court in its final choice of value herein.
With respect to fixtures the court is convinced that the appraiser did not value any items of trade fixtures but only those items such as air-conditioning units which are attached to the building and which fall within the definition of real property as contained in section 102 (subd. 12, par. [f]) of the Real Property Tax Law. That section, in pertinent part, provides that:
“ 12. ‘ Real property ’, ‘ property ’ or ‘ land ’ mean and include:
“ * # * (f) Boilers, ventilating apparatus, elevators, plumbing, heating, lighting and power generating apparatus, shafting ’ ’.
Air conditioning units, of the types involved on this property, must be considered either ventilating apparatus or plumbing facilities. As such, they are taxable as part of the real property regardless of who installed them and regardless of who would have right of removal or claim in eminent domain. The court, therefore, adopts respondent’s building values with the exception of the $536,000 item for tax year 1969.
With respect to land value, the difficulty of valuing this unique property is compounded by the fact that the entire center is divided into several different tax lots, not all of which are under review. Each appraiser approached the problem somewhat differently.
Petitioner’s first expert (Powers) valued the entire 118-acre tract and found unit values ranging from $2.30 per square foot on May 1, 1965, to $3.50 in 1969. He then valued those parcels which were not included in this proceeding comprising some 18 *186 acres and improved with structures serving the prime tenants of the area. For example, in 1969 he found the full value of the entire 118-acre tract to be $18,000,000 from which he deducted $10,775,000 as the value of the land not under review. He divided the resultant $7,225,000 by the 4,356,000 square feet under review and arrived at a unit value of $1.66 for May, 1969. In this manner he found unit and total land values as follows:
Tax Status Date
Square Foot Unit Value
Total Value
Indicated Acreage Value
May 1, 1965 1.13 4,900,000 49,000
May 1, 1966 1.25 5,400,000 54,000
May 1, 1967 1.35 5,900,000 59,000
May 1, 1968 1.50 6,500,000 65,000
May 1, 1969 1.66 7,200,000 72,000
Petitioner’s second expert (Heymann) also added the parcels not under review to the 100 acres under review, valued the entire tract and deducted the values of the nonincluded parcels. He found an overall value of $3.25 per square foot for the 118 acres and an overall land value of $16,700,000. He deducted $11,800,-000 for the value of nonincluded land and found a value .of $4,900,000 for the subject parcels in May of 1965. He then increased this value by 2% per year.
[Material omitted as not of sufficient interest.]
Respondent’s expert (Adels'berg) valued the major shopping lot “ giving recognition to the fact that the smaller areas covered by buildings owe a large measure of their income producing capacity to the auxiliary areas used in common for parking fields, access roads, malls, walks, etc. As small plots were separated from the major lot, they acquired substantial increased values from the non-exclusive easements and rights they retained in the large common areas ”. Accordingly, he found different acreage values for each parcel under review.
[Material omitted as not of sufficient interest.]
The areas under review are the major shopping center structure (26 N or 26 K), a skating* rink (283), recharge basin (292) and southerly access road (1421 or 295). N,ot included in this review are structures utilized for Macy’s, Gimbels, Franklin National Bank parking area, Century Theatre, Macy’s Auto Center, Van’s Car Wash and water district well sites.
It is impossible to value a portion of this center in a vacuum, and all appraisers have agreed, as evidenced by their approaches, that consideration must be given to the total opera *187 tion. Their treatment of the allocation, however, is much different. Petitioners deduct the value of the desirable and non-protested portions while respondent finds that it is the subject parcels which generate the enhanced value of the “ out ” parcels.
While both approaches have conceptual merit, the enhancement approach of the respondent is most difficult to translate into mathematical computation. On this record, the court believes that the value of the parcels under review can best be valued under the petitioner’s theory in general and the analysis of the expert Powers in particular. However, the court emphatically does not agree with his statement that “ the subject parcel can be thought of as nothing else than an interior piece (appraisal p. 50) ”. This is a totally integrated, fully independent shopping center with its own system of roads. It has frontage not only on Old Country Road and Stewart Avenue, both of which are major, wide east-west arteries, but also enjoys direct access to and egress from Meadowbrook Parkway, a north-south limited access highway. There is nothing “interior” about this parcel at all.
There are several problems in the appraisal itself. For example, in substracting the parking lot of the Franklin Bank, he deducted $4.50 per square foot which must be compared with his conclusion that the subject parcels are worth $1.66 in 1969. While bank property may be more desirable than commercial property in general due to the desirable nature of the tenant, bank parking lots should not be almost three times more valuable than adjacent land. Petitioner’s expert has been most liberal in allocating value for the “ out ” parcels. He has been correspondingly conservative in fixing value for the subject parcels.
The court finds that petitioner’s $1.66 value is a good indication of value not in 1969 but rather for the first year under .review. Translating that unit into an acreage value results in an indicated land value of $72,300 for the first year. The court accepts respondent’s increment of 10% per year.
The court further finds that these values apply to each part of the shopping center under review, including roads, the sump and the skating rink. The court finds the following land values:
Tax Status Date
Unit Value Per Acre
Total Market Value
May 1, 1965 72,300 7,230,000
May 1, 1966 79,530 7,953,000
May 1, 1967 87,483 8,748,300
May 1, 1968 96,231 9,623,100
May 1, 1969 107,854 10,785,400
*188 Adding these land values to the building values as previously discussed produces the following cumulative results on all lands under review:
Tax Status Date
Land
Improvements
Total
May 1, 1965 7.230.000 8,004,050 15,234,050
May 1, 1966 7.953.000 8,196,800 16,149,800
May 1, 1967 8,748,300 8,092,050 16.840.350
May 1, 1968 9,623,100 9,464,250 19.087.350
May 1, 1969 10,785,400 10,307,000 21,092,400
These values, then, indicate the maximum amount which could he set as a value for real estate tax purposes. (Manhattan Square [Beresford], supra.)
With income producing property, however, the capitalization of income approach is usually a sure guide to value. (See Matter of the City of New York [Madison Houses], 17 A D 2d 317; Matter of Seagram & Sons v. Tax Comm., 18 A D 2d 109, affd. 14 N Y 2d 314; Matter of Pepsi-Cola Co. v. Tax Comm., 19 A D 2d 56; Matter of United States of Amer. v. Tax Comm., 22 A D 2d 290; Killip Laundering Co. v. State of N. Y., 32 A D 2d 579; J. W. Mays, Inc., v. Tax Comm., 21 A D 2d 801, affd. 16 N Y 2d 529.)
In these cases, however, the capitalization approach did not automatically control the ultimate findings of value. In the Mays case (supra), the Court of Appeals affirmed a finding of the Appellate Division of value at $5,400,000. That court had found a land value of $1,000,000 and a ¡sound value of $4,472,410. Under an economic approach the land was found to be worth $980,000 and the building $3,300,000. Had the economic approach controlled, the total assessment would have been over $1,100,000 less than was ultimately found. Instead, the Appellate Division stated that “ the economic worth of the improvement has persuasion ” (21 A D 2d 801, 802).
In both the Seagram case and the Pepsi-Cola case (supra), the courts rejected strict application of rental income. In Seagram the Court of Appeals agreed that the building was erected for other than commercial rental income (14 N Y 2d 314, 318), and in Pepsi-Cola the First Department (19 A D 2d 56, 61) found that the record did not satisfactorily explain “ the wide disparity between the structural value and the estimated rental value ”. The court also found that petitioner’s expert had not properly supported his estimates of rental value. (See, also, Woolworth Co. v. Comm. of Taxation and Assessment, 26 A D 2d 759; People ex rel. Gale v. Tax Comm., 17 A D 2d 225.)
*189 The total impact of these various cases would appear to he that structural value is of some significance other than merely to establish a maximum value and that, while the economic approach is a sure guide in the ordinary case, it must be fully substantiated and applied with caution.
This court briefly summarized the complex 1963 sale of the subject parcel in its earlier decision (Matter of Roosevelt Field, Inc. v. Podeyn, 47 Misc 2d 677, 682, supra) on this shopping center. It observed that: ‘1 This is by no means a complete summary of the transaction but it should serve to indicate the futility of using this, or probably the sale of any other regional shopping center, for the purpose of arriving at fair valuation for tax purposes. ’ ’
The court adheres to that belief. Respondent’s expert attempted to analyze several transfers of shopping centers. All were most intricate and all of which, save one, had a lease back provision. The court reaffirms its 1964 opinion and finds that the cost and economic approaches to value are the approaches to be utilized.
Respondent’s expert appeared for the county in the earlier proceeding and continues to represent the same client in this proceeding. In addition to his shopping center sales, he has evaluated the existing center by estimating economic rentals. However, he has, in many instances, ignored the actual facts that affect this property and its leases. For example, he has indicated that the tenants should be paying for the maintenance of the common areas and that modern tax escalation clauses should be utilized on all tenants.
While such changes would be beneficial for the owner of the center, such was not the case on the tax status dates, and ‘ ‘ the actual rent realized is significant as an important factor in determining what the fair rental value is ” (Woolworth Co. v. Comm. of Taxation and Assessment, 26 A D 2d 759, 760, supra).
The court will, accordingly, utilize the actual rental income as a basis for the capitalization process. With respect to actual income, however, the court holds that tax contributions by tenants should not be added as income, nor should the actual taxes paid be deducted as expenses, for they are the product of the assessment complained of.
The more accurate solution is to capitalize the tax rate and to ignore the income frorn tenants paid pursuant to tax clauses.
Another area of disagreement has been the vacancy factor. Considering the property under review as a whole, as containing 800,000 square feet of rentable area, there were substantial *190 vacancies of descending magnitude, ranging from 221,100 square feet in the first year under review to 55,580 square feet in the last year.
Petitioner’s expert (Powers) utilized a vacancy factor of 10% in the first two years, 7%% in the next two and 5% in the last.
The court does not find that any vacancy factor is proper much less factors of the magnitude of petitioner’s expert.
In the first place, actual rentals are utilized as a basis for capitalization. Any vacancies that may have occurred will therefore be fully reflected. In addition, the vast majority of the unrentable space was basement area, and one of the prime reasons for difficulty in renting was a leaking condition in that area. The leaks stopped, for the most part, when the enclosed mall was erected. Vacancies dropped significantly at that point and could, perhaps, have been reduced earlier had some waterproofing been done. Nevertheless, there is little basis for applying an overall 10% factor when the majority of vacancies were only basement areas.
The court will deduct, however, respondent’s 4% factor for contingencies. Applying this factor to the actual gross income as set forth in petitioner’s exhibits 19 and 20 produces the following net income:
Tax Status Date
Gross
Expenses
Net
May 1, 1965 1,682,116 1,078,779 603,337
May 1, 1966 1,866,284 1,061,707 804,577
May 1, 1967 2,046,466 924,271 1,122,195
May 1, 1968 2,273,613 864,368 1,409,245
May 1, 1969 2,476,362 913,349 1,563,013
Insofar as capitalization rates are concerned, both of petitioner’s experts applied a higher rate to overage rentals than to the basic rentals reserved in the leases.
Powers, under his building residual approach, applied rates to land ranging from 7% in 1965 to 8.75% in the last year under review. Similarly, his rate for the building rose from 9.27% to 11.25% and for overage rents from 12.77% to 15.625%.
Petitioner’s expert Heyman also utilized a building residual approach with land rates ranging from 7.5% to 8.5%, building rates of 10.44% to 11.33% and 14.19% to 16.08% for the average income.
Respondent’s appraiser applied on overall rate of 8% for all years in question and applied that rate to both minimum and overage rentals. In the case at bar, the court finds that there is little justification for applying the higher rate to over *191 age. While it is true that the amount involved may vary from year to year, overage rentals have been paid during every year under review. As respondent’s expert stated, these are for the most part well rated tenants and during times of inflationary trends the same volume of sales will produce higher percentage rents.
The court finds that fair overall rates during the years in question are 7.50% in the first year to 7.75%, 8.00%, 8.50% and 9.00% in the final year under review. Adding in the capitalized tax rate produces the following overall rates which when applied to the net income produces the following indicated economic values:
Tax Status Date
Rate
Indicated Value
May 1, 1965 11.55 5,223,658
May 1, 1966 12.32 6,530,657
May 1, 1967 13.11 8,559,831
May 1, 1968 13.51 10,431,125
May 1, 1969 14.41 10,846,726
These results must be compared with the court value under the cost approach as follows: ’s findings of
Tax Status Date
Cost Approach
Economic Approach
May 1, 1965 15,234,050 5,223,658
May 1, 1966 16,149,800 6,530,657
May 1, 1967 16,840,350 8,559,831
May 1, 1968 19,087,350 10,431,125
May 1, 1969 21,092,400 10,846,726
It is not uncommon to find differences between economic and summation values. In this case, however, the results show an extremely abnormal disparity.
The property is burdened with a certain amount of functional obsolescence. For example, the truck tunnel is out of date with respect to servicing modern trucks. It is somewhat inadequate in height and laid out in a rather inefficient manner. Another difficulty involves the obvious problem of snow removal on a 100-acre site.
There are several other problems which work adversely to the economic disadvantage of the portion under review. The most significant are that:
1) Macy’s lease agreement provides that store with “ veto ” power over other stores coming into the area. It is asserted that this power has kept several large retailers out of the area. However, Gimbels was permitted to build and opened in 1962, and a large J. C. Penney store is now under construction on *192 the parcel utilized during the years here in question as the skating rink.
2) Both Macy’s and Grimbels leases provide for parking ¡of 7 to 1 — seven spaces for every thousand feet of leasing area. The usual ratio, according to petitioner’s witness, is 5:1.
Other problems, such as maintenance of walks and roads, vandalism and pigeons, are not unique to this center, and although the amount of money required to service these problems should be higher than for a smaller structure, the percentage cost should not be much different than in any other facility.
The court comes to the inescapable conclusion that the disparities are generated by the fact that only a portion of the entire center is under review. The mathematical gymnastics which all appraisers have applied underscore the fact that it is exceedingly difficult to value this segment ¡of the whole. Values of nonincluded properties have been added in and subtracted out at an alarming rate. Enhancement to the subject parcels from the subject parcels has been discussed as has the detraction arising from the ‘ ‘ burdensome ’ ’ leases on the other, major and nonincluded tenants.
Under all of the circumstances of this case, the court finds that the greater weight should be accorded to the summation value but that the economic difficulties attendant upon the subject property must be considered, particularly in the earlier years under review (J. W. Mays, Inc., v. Tax Comm., 21 A D 2d 801, affd. 16 N Y 2d 529, supra).
Accordingly, the court finds the following values for all of the properties under review during each of the years in question:
Tax Status Date
Land
Total
May 1, 1965 7.230.000 13.000. 000
May 1, 1966 7.953.000 14.000. 000
May 1, 1967 8,748,300 16,500,000
May 1, 1968 9,623,100 18.000. 000
May 1, 1969 10,785,400 20,000,000
Applying the stipulated ratios and apportioning the found values among the several tax lots as was done by petitioner’s expert, the court makes the following findings of indicated assessed valuation for each of the tax lots involved as of each respective tax status date. Both of the petitioner’s experts have utilized the proportion of value reflected by the assessors in their apportionment. Respondent’s expert calculated each tax lot more precisely, and application of his approach demonstrates the accuracy of utilizing the proportion method in this case.
*193 [Material omitted as not of sufficient interest.]
Petitioner has made an application for a further award of costs under subdivision 2 of section 722 of the Beal Property Tax Law on the basis that the assessment on the subject property was raised inconsistently with the court’s prior determination. The application is denied. That section permits costs where the assessment is raised without adequate cause or is grossly discriminatory. On this record neither condition exists.
It appears that the assessments are reasonable and accurate on each lot in the last two tax years.
Bespondent, however, is instructed to reduce the remaining assessments as indicated herein.