Howard T. Hogan, J.
In this consolidated tax certiorari proceeding petitioner protests the assessed valuation placed upon several tax lots which have been improved with a multi-family apartment house. The property is designated on the Land and Tax Map of Nassau County as Section 48, Block 447, Lots 58, 79, 159, 205, 280, 281 and 282, all in School District 22, Town of Oyster Bay. The tax status years are May 1, 1965, to and including May 1, 1970.
The parties have stipulated as to the ratio of assessed valuation to full value as follows:
May 1, 1965, through May 1, 1968 — 33%%;
May 1, 1969 — 32%;
May 1, 1970 — 30%.
*919 The ¡only issue before the court is that of overvaluation.
This property under review is situated on the south side of Fulton Street, approximately 400 feet east of Heisser’s Lane, in the Incorporated Village of Farmingdale. It has a frontage of approximately 325 feet on Fulton Street and extends in a southerly direction 374 feet to the Long Island Railroad, thence westerly to Heisser’s Lane where it has a frontage of about 150 feet. Total area is 178,500 square feet. The zoning [Business D] permits commerical as well as garden-type apartment use. The land is improved with six separate two-story, non-fireproof brick garden-type apartment houses with partial basements or crawl spaces. There are a total of 91 apartments including the six-room basement apartment for the superintendent.
The grounds are well landscaped, improved with a modern swimming pool which is fenced. Some apartments have terraces, other patios. There are 14 3-room apartments 56 3%-room apartments, and 20 4-room apartments, all with baseboard radiation and air conditioning sleeves for wall units. There are also a one-story brick veneer boiler and storage building. All apartments have the usual amenities, such as kitchen stoves, refrigerators, sink and Formica counter tops, bathrooms with recessed tub and shower and ceramic tile floor.
Hear the beginning of the trial the respondents moved that since the only issue raised for the tax years beginning May 1, 1965, through May 1,1968, was overvaluation and since the writs for those years indicate market value to be $1,155,767, based upon the stipulated equalization rate of 33%%, the assessment was sustained and, therefore, the writs for those years should be dismissed, citing': Matter of Trustees of Sailors’ Snug Harbor in City of N. Y. v. Tax Comm, of City of N. Y. (32 A D 2d 658) ; People ex rel. Sutphen v. Feitner (27 Misc. 384) ; Matter of Mid Point Apts. v. Town of Poughkeepsie (59 Misc 2d 846) ; Rijek Realty v. Crist, (16 A D 2d 964). Respondent argues that based upon the writs alone, the petitioner has failed to establish a triable issue since by the petitioner’s own sworn statements, it is demonstrated that the property is not 'assessed in excess of its true market value.
The motion is denied. This court is not unmindful of the case law cited by respondents. However, this is not a situation where all the pertinent facts were admitted or pleaded by petitioner or, where it appears in the pleadings of the petitioner, it could not succeed upon the trial of the issue. The petitioner’s pleadings admit of no such interpretation. In the petitioner’s *920 protests, with the accompanying data, the petitioner clearly indicates it will rely on the capitalization of income method to determine market value. Income and expenses were detailed for the first year of operation. Despite the fact this year was not protested, it did reveal the approach intended to be used in this proceeding and so stated. Moreover, actual rent received and expenses incurred during the years are highly relevant in ascertaining market value. (Matter of Pepsi-Cola Co. v. Tax Comm. of City of N. Y., 19 A D 2d 56 ; People ex rel. Gale v. Tax Comm. of City of N. Y., 17 A D 2d 225.)
Statements made by the petitioner in his protests were inconsistent in that reference was made both to cost of reproduction and income approaches to value. Where .the protest requests particulars, the petitioner asserts, ‘ ‘ Applicant claims that assessed valuation should be reduced because valuation on the basis of capitalization of income does not yield a fair return.”
As this court has indicated on other occasions, these are statutory proceedings. Ordinarily, petitioners are uninformed as to the significance of the questions and questionnaire prepared by the respondents.
The question at bottom in all of these cases in a petition for a writ of certiorari to review an assessment is whether the petitioner sufficiently and specifically points out to the Assessors the basis, the reasons and extent of its objections. The court finds it has. The questionnaire is prepared by Government or lawyers in government, and these questions call for technicalities of distinction between illegality, overvaluation and inequality. Should a taxpayer aggrieved by an assessment be penalized or denied relief because he does not know the niceties of these distinctions ? Should his case be summarily dismissed because he has said one thing and means another or because he is confused as to the technical meanings, even though the nature of his grievance is clear? I think not.
This court has held in American Bosch Arma Corp. v. Pelcher (N. Y. L. J., July 28,1969, p. 11, col. 6) that the important jurisdictional fact in a tax certiorari proceeding is an allegation that the assessed valuation should be lower than the tentative assessment by a stated amount. Section 706 of the Real Property Tax Law requires a petitioner claiming overvaluation to state the extent of it (People ex rel. Ward v. Sutton, 230 N. Y. 339, 341). The purpose is to acquaint the taxing authorities of the dollar amount thereof (Matter of Reservoir Estates v. *921 Paulus, 47 Misc 2d 754, 755). This the petitioner did when it alleged that the assessment should be $250,000, hereby indicating a fair market value of $750,000.
Moreover, by so doing, the petitioner has met the requirements of section 6-11.0 of the Nassau County Administrative Code by specifying it bases its protest on the capitalization of income which did not generate a return to sustain the respondents’ assessment. (See, also, Real Property Tax Law, § 512.)
Review of assessments should be liberally construed so that a taxpayer’s right to a review is not defeated by technicalities (People ex rel. Bingham Operating Corp. v. Eyrich, 265 App. Div. 562). We have previously held that in a county such as Nassau which assesses at less than true value — somewhere between 25% and 33%% of full value — a true overvaluation case in the traditional sense is impossible. Hence, every case is an inequality situation (Matter of Levin v. Pelcher, N. Y. L. J., July 17, 1970, p. 9, col. 8). By the very nature of the assessment procedure followed in this county, the Assessors are fully aware of petitioner’s grievance. The exact numerical extent of the overassessment as claimed by this petitioner is very obvious.
The assessed valuations for each of the years under review, transposed into full valuations based upon the opinions of the two real estate appraisers, indicate the following:
ASSESSORS PETITIONER RESPONDENTS
May 1,1965................... $1,116,366 $817,000 $1,050,000
May 1,1966................... 1,116,366 818,000 1,050,000
May 1,1967................... 1,116,366 825,000 1,025,000
May 1,1968................... 1,116,366 830,000 1,030,000
May 1,1969................... 1,090,937 845,000 1,040,000
May 1,1970................... 1,163,667 840,000 1,055,000
Both real estate appraisers included economic approaches to value in determining the true market value. In so doing, both testified they used actual rents and actual expenses.
It developed upon the trial, however, that the plain, simple word “ actual ”, in the eye of the appraiser, has many and varied connotations. The income and expense figures, as found by both experts, are open to serious question for many reasons. The word “ actual ” as defined in Funk & Wagnall’s New Standard Dictionary of the English Language means, ‘ ‘ existing in fact as distinguished from conjectural or imputed by construction ”.
Petitioner’s appraiser used the actual income and expenses as furnished by the accountant, but with the actual, he then proceeded to make certain judgments of his own. For example, he *922 disregarded income from the laundry machines, and while he testified that his estimate of actual income was based on the leases, he took from the accountant’s statement only “ whatever income he thought was applicable
In the first year he agrees there is a difference of in excess of $10,000 between the actual income as reported by the accountant and his own estimate. The following tax year he concedes a difference between the actuals of the accountant and his own estimate of $20,000. His allocation of 30% to 45% for economic depreciation 11 by reason of the proximity of the railroad and other factors ” is unsupported by the evidence. The rent rolls, however, indicate an increase in value. For example, Apartment 10 in 1966 rented at $161 per month; rerented in 1968 for $178 per month; rerented in June, 1969 for $186 per month, each time to the same tenant.
His counterpart, the expert of the respondents, not to be outdone, also took excursions into the ‘ ‘ nether nether land ’ ’ in his use of the economic approach after the initial years under review. As to the tax years beginning May 1, 1965, and May 1, 1966, he elected to rely upon the summation approach to value. While this method may be utilized, it has long been recognized that it sets the upper limits of value beyond which property may not ordinarily be assessed (Matter of Roosevelt Field v. Podeyn, 47 Misc 2d 677. Albany Country Club v. State of New York, 37 Misc 2d 134, mod. 19 A D 2d 199, affd. 13 N Y 2d 1085). He further stated that in his opinion available construction cost for a new building was the best indicator of meaningful value. He testified that this evidence outweighed any income approach because during the first years there are always attendant problems in renting and concessions usually are made to obtain tenants.
After the first two years he then started his estimations, his projections, his anticipations and his prorations of the “ actuals ” as he saw them — both for the income and expense. His analysis involved an ‘ ‘ actual appraised income and expense study and an estimated income and expense study ”. In order to reach his capitalization rate, his method was the band of investment theory, which attempts to combine all the component parts of a real estate investment and to find the proportion of net income required for equity return in addition to return on borrowed capital.
One cannot quarrel with his contention that this property could not be properly measured during the first years by reliance upon *923 the reported income for the reasons given. It would not be a sound basis for an economic projection. The court will not apply that approach for the first two years under review.
However, when the economic approach is used, there must be very careful scrutiny of the actual income and expense, and when one refers to ‘ ‘ actuals ’ ’, it means just that and not the connotation given to this plain, simple word by some appraisers. For example, the books and records show that for the year 1965, the actual expenses for water and sewerage were $542; the respondents ’ appraiser allocated $1,000. For the same period, insurance premiums were $2,025; he allocated $3,000.
To further illustrate the disparity in judgment between these two appraisers, both of whom purportedly relied upon actuals, for the year 1967 petitioner’s witness found the actual expenses to be $46,480, and for the same period respondents’ witness allocated $42,713 — a difference of nearly $4,000. This was true throughout the years under review.
Admittedly, these appraisers started out with an actual income or expense item and raised or lowered these as their individual judgments dictated. To compound the problem, the figures which they project cover different time periods. The difficulty with proration of income and expenses is that the resultant figures will vary considerably from the actuals, resulting in distortions, and making most difficult the task of comparing the findings. For example, contemplation of additional income by disregard of the leases, disregard of the true income and expense, is, in my judgment pure speculation unless the reason for the rejection is detailed and substantiated. An arbitrary rejection and subjective adjustment is, as one of the experts more aptly referred to it, “ finagling ” with numbers.
Artificial methods used by appraisers evolve with niceties that distort the truth. As Mr. Justice Tessleb. said, ‘1 This unrealistic and artificial method produces an inescapable sequitur of a lower and/or higher valuation, depending upon whose interest is sought to be served ”. (Matter of Lika v. Tax Comm. of City of N. Y., Sup. Ct., Queens County, Index No. 1398/69, March 31, 1969.)
This is not the purpose of a tax certiorari proceeding. Like any other lawsuit, its goal is a search for the truth. It is not a matching of wits between real estate experts nor the manipulation of numbers to confound or confuse, or to serve one’s own ends. Accordingly, the court will seek to allocate from this complex of adjustments and maze of calculations a finding ascer *924 tained from the documented record rather than to voyage into the mythical ‘ ‘ Land of Oz ’ ’.
The court finds respondents’ vacant land sales in close proximity are the better indicators and while not enthralled with the “unit” approach, adopts land values, hereinafter set forth. The values are respondents ’ values, trended for time in each of the years under review. It adopts the actual construction costs for the first two years and disallows the alleged functional and economic obsolescence as being unsubstantiated. This is a viable property located in a growth area and comfortably existing in a competitive market.
The documented gross income for each of the succeeding years substantiates a gross income per year beginning with May 1, .1967, of $171,813; $181,366; $193,970 and $205,000.
From these respective gross incomes, a 2%% vacancy factor is allowed which results in the following respective adjusted gross incomes: $167,518; $176,835; $189,121; and $199,875.
The court finds the following expenses as indicated by petitioners ’ expert for each of the years valued under this approach:
May 1, 1967 May 1, 1968 May 1, 1969 May 1, 1970
Salaries................ ... $13,300 $14,000 $14,500 $15,000
Insurance.............. 3,400 3,400 3,360 3,800
Fuel................... 6,000 7,500 8,370 9,500
Gas & Electric.......... 1,960 2,500 2,550 3,000
Water................. 920 1,800 2,120 2,500
Replacements........... 4,500 4,500 4,500 4,500
Painting............... 4,000 4,500 3,500 3,500
Management (2ü%) • • • • 4,295 4,500 4,850 5,125
Repairs & Misc......... 7,500 7,500 7,500 7,500
Total Expenses......... ... $45,875 $50,200 $51,250 $54,425
The respective net incomes for purposes of capitalization are, therefore, as follows: $121,643; $126,635; $137,871; $145,450.
The petitioners’ appraiser found overall capitalization rates ranging from 10.4% in May, 1967 to 11.8% in May, 1970. Respondents’ expert found basic overall rates ranging from .0847 to .0988.
The court finds the following basic overall rates to which the respondents capitalized tax rate is added:
Capitalized Total
Overall Bate Tax Rate Cap. Rate
May 1, 1967..............................085 .0484 .1334
May 1,1968.............................09 .0533 .1433
May 1, 1969.............................095 .0573 .1523
May 1,1970.............................10 .0602 .1602
*925 Dividing the net income by these rates results in the following overall valuation for the entire properties encompassed by this proceeding, both in land and in building.
121,643
-= 911,866 May 1, 1967
.1334
126,635
-- 883,705 May 1, 1968
.1433
137,871
-= 905,259 May 1, 1969
.1523
145,450
-= 907,927 May 1, 1970
.1602
From each of these totals, the court ascribes a value for land as per respondents’ appraiser in order to arrive at an allocation of full value between land and buildings.
May 1, 1967............. ............. 691,866
Land.............. ............. 220,000
Total.............. ............. 911,866
May 1, 1968............ ............. 648,705
Land.............. ............. 235,000
Total.............. ............. 883,705
May 1, 1969............. ........... Buildings........... ............. 650,259
Land.............. ............. 255,000
Total.............. ............. 905,259
May 1, 1970............ ............. 632,927
Land.............. ............. 275,000
Total.............. ............. 907,927
These full values must now be apportioned between the respective tax lot parcels and subjected to the applicable stipulated ratio. It appears that 60% of the value is contained in the parcel designated Lots 58, 79,159 and 205. The following chart reflects the apportionment and finding of indicated assessed valuation for each:
*926 INDICATED
FULL VALUE ASSESSED VALUE
Lots 58-79 Lots Lots 58-79 Lots
159 & 205 280-282 159 & 205 280-282
May 1, 1965
Land.............. ........ $118,760 $ 81,240 $ 39,587 $ 27,080
Buildings.......... ........ 521,040 328,960 173,680 109,653
Total.............. ........ 639,800 410,200 213,267 136,733
May 1, 1966
Land.............. ........ 124,700 85,300 41,567 28,433
Buildings.......... ........ 521,040 328,960 173,680 109/653
Total.............. ........ 645,740 414,260 215,247 138,086
May 1, 1967
Land.............. ........ 132,000 88,000 44,000 29,333
Buildings.......... ........ 415,120 276.746 138.373 92,249
Total.............. ........ 547,120 364.746 182.373 121,582
May 1, 1968
Land.............. ........ 141,000 94,000 47,000 31,333
Buildings.......... ........ 389,223 259.482 129.741 86,494
Total.............. ........ 530,223 353.482 176.741 117,827
May 1, 1969
Land.............. ........ 153,000 102,000 48,960 32,640
Buildings........... ........ 390,155 260.104 124,850 83,233
Total............... ........ 543,155 362.104 173,810 115,873
May 1, 1970
Land............... ........ 165,000 110,000 49,500 33,000
Buildings........... ........ 379,756 253.171 113,927 75,951
Total............... ........ 544,756 363.171 163,427 108,951
Based upon this record the court finds that the subject property was not overly assessed for the first two years under review, and as to the tax years beginning May 1, 1965, and May 1, 1966, the petition is dismissed. As to the remaining years, the petition is sustained.