Paul C. Reuss, J.
The claimant herein is a nonprofit membership corporation organized under the laws of the State of New York. On January 3, 1961 and for many years prior thereto it operated a country club located on a tract of land comprising approximately 301 acres, situated partly in the City of Albany and partly in the Town of Guilderland, New York. On the aforesaid date the State of New York appropriated in fee for educational purposes pursuant to the Education Law (§§ 307, 355) two parcels of the claimant’s land situated partly in the Town of Guilderland, County of Albany, and partly in the City of Albany, County of Albany, New York, comprising 220.4 acres, by filing a copy of Map No. 14, Parcels 1 and 2 with a description of the property appropriated, in the office of the County Clerk *135 of Albany County. On the same date the State of New York, pursuant to chapter 572 of the Laws of 1947, appropriated in fee for the purposes of a State building site an additional portion of the claimant’s land situated in the City and County of Albany comprising 80.6 acres, by filing Map No. 211, Parcel No. 300 with a description of the property so appropriated, in the office of the County Clerk of Albany County. On the trial it was established that 8.5 acres of the land appropriated pursuant to Map No. 14, Parcels 1 and 2, comprised a paper street, the title to which was not in the claimant.
The both parties have agreed that the entire appropriation comprised 292.5 acres of the claimant’s land. The several takings will be considered as one. A single award shall be made herein which will be apportioned upon stipulation of counsel on our approval.
The court adopts the descriptions of the appropriated property shown and set forth on the aforesaid maps and reference is made thereto for such descriptions without further repetition thereof.
The claim herein was filed in the office of the Clerk of the Court of Claims and served upon the Attorney-General on July 26,1961, and has not been assigned.
The court has viewed the subject premises.
On the date of the appropriation the claimant’s property fronted on Western Avenue in the City of Albany for 349.87 feet and in the Town of Guilderland for 493.97 feet, on Fuller Road 300.30 feet in the City of Albany and 597.8 feet in the Town of Guilderland, and 2,354.8 feet on Washington Avenue in the City of Albany. Some 186.5 acres were located within the City of Albany and 106 acres were located in the Town of Guilderland. The Western Avenue frontage located in the City of Albany was zoned for business for a depth slightly over 100 feet. The portion of the club land located within the City of Albany was zoned either A or B Residential, and all of the property situated within the Town of Guilderland was zoned Residential R-12 which restricts the use to one-family dwellings.
The premises were improved by an 18-hole golf course and a group of buildings and other structures devoted to the activities of the club. The main building was the clubhouse, a large two-story structure part of which was built sometime in the nineteenth century; however, this building had been substantially improved and was in very good physical condition, although the general layout had some features of obsolescence. The other major structure was an Olympic-size swimming pool constructed in 1959. In addition thereto there was a golf shop, a building *136 which served as the golf professional’s house, the superintendent’s house, a barn, a bathhouse, four clay tennis courts, a parking lot and various other structures used in the club’s activities. Entrance to the premises was by means of a two-lane concrete road, leading from Western Avenue. The structures were generally in good condition although one or two of them were quite old and in need of some repair; however, all were well adapted to the purposes of the club. The golf course was equipped with an excellent irrigation system, service roads, rain shelters and other necessary structures and improvements. A lake located on the premises supplied necessary water for the golf course and the pool. The lake site was improved by a dam and pumping station with equipment and controls. The golf course was also enhanced by the existence of a large number of trees which not only provided an aesthetic setting but also had practical value as hazards which added to the challenge afforded by the course, served as screens and wind breaks, and helped to reduce erosion. There is no doubt that the premises were ideally adapted to the use to which they were put at the time of the appropriation.
The golf course itself and its adjacent areas comprised approximately 170 acres including the clubhouse complex. The remaining lands were not used by the club; however, shortly before the appropriation the claimant initiated steps to determine the best use for the surplus land around the perimeter of its property, but had actually done little else to utilize such property.
The State’s experts valued the claimant’s property as slightly more than $2,000,000 while the claimant’s experts placed a value on the premises in excess of $5,000,000.
Upon the trial the appraisers split up the property and valued the several segments of the tract according to the best available use for each such segment. We will also use the same approach herein.
We find that 300 feet to a depth of approximately 150 feet of the claimant’s Western Avenue frontage in Albany was available for commercial development, and that the fair market value of this frontage was $300 per front foot, for a total of $90,000.
That 275 feet of the Western Avenue frontage to a depth of approximately 150 feet in the Town of Guilderland was available for commercial development, and the fair market value was $275 per front foot, for a total of $75,625.
There was not too much diversity between the experts with respect to the front-foot value of the Western Avenue frontage. They relied primarily on sales adjacent to the claimant’s Western Avenue frontage. One occurring December 13, 1961 involved a corner property which was quite deep. The selling *137 price of such parcel indicated a value of $378 per front foot. We regard this tract as somewhat superior to the claimant’s Western Avenue property, particularly because of the corner influence. The other three sales took place on February 26,1957, May 15,1958 and August 30,1960 respectively. The selling price of each indicated a front-foot value of $250. These sales involved property which we regard as somewhat inferior to that of the claimant, because of size or restrictions. However, we have considered such sales in arriving at our determination, giving weight to them based upon their similarity to the subject property, and on the proximity of their occurrence to the date of the subject appropriation.
The frontage in the Town of Guilderland was, at the time of the appropriation, zoned residential. All parties agree that there is no question but that the probabilities for a zoning change to commercial were excellent at the time of the appropriation, and we therefore have added a considerable increment to the value of the residential frontage, based upon the probability of the rezoning. But, no matter how probable a change may seem, an element of uncertainty remains and it has its impact upon the selling price (Masten v. State of New York, 11 A D 2d 370, affd. 9 NY 2d 796) and therefore we have placed a somewhat lower valuation upon the frontage in the Town of Guilderland.
We find that the value of the entire Western Avenue frontage at the time of the appropriation was $165,625.
We find that at the time of the appropriation the claimant had 2,294 feet of frontage on Washington Avenue to a depth of 490 feet at its east end and to a depth of approximately 290 feet on the west end, with an average depth of approximately 400 feet, available for development for commercial uses providing the zoning thereof could be changed from residential to commercial. In addition to the rezoning, in order to utilize this frontage, a relocation of several holes of the golf course would be necessary.
We accept the claimant’s plan for relocating three holes for we find such plan was the more practical one, and provided for greater depth for the Washington Avenue frontage, and utilization of surplus acreage in such area. We also accept the claimant’s estimate of cost of doing the work involved in the amount of $53,952.50 since it covers the plan we adopt and in addition thereto was more definite and specific than the State’s estimate of relocating two holes. The amount of such estimate, of course, must be deducted from the value we place upon this particular tract of land.
At the time of the appropriation Washington Avenue was one of the principal means of access from the City of Albany to the *138 western entrances of the Thruway and the Northway. It is unquestioned that by reason of its location the Washington Avenue frontage constituted a very valuable piece of property for commercial development, providing it could be rezoned to allow such use.
The claimant’s experts in their appraisals of the Washington Avenue frontage relied primarily on a lease of the Thruway Motel site located on the north side of Washington Avenue adjacent to the subject property. This lease indicated a front-foot value for commercial land in excess of $500 a front foot. However, while we have given considerable weight to this transaction, we cannot overlook the fact that such lease was negotiated at a time when the property was actually zoned commercial and it was the only property in the general vicinity on Washington Avenue so zoned.
Claimant also relied to some extent on certain sales in the general vicinity of Colvin Avenue at its intersections with Washington Avenue and Central Avenue and on Central Avenue. However, this section, at the time of these sales, was in a more advanced stage of becoming a highly developed commercial area, than the subject area. Nevertheless, we have given some consideration to these sales as indicators of commercial values in the vicinity.
The claimant’s experts appraised the Washington Avenue frontage at $450 to $460 per front foot respectively, and stated that its highest and best use was for commercial development. There is nothing in their testimony to indicate this figure is based on the probability of a rezoning, rather than on rezoning as an accomplished fact. One of the State’s witnesses refused to consider the commercial potential of the Washington Avenue frontage because of the zoning restrictions. The other State witness placed a value of $400 a front foot on the frontage provided it was zoned commercial. However, this witness limited the depth to 250 feet. The value of $225 per front foot he actually placed upon the property was based on a zoning as residential with an increment added for the probability of a zone change, following the rule of Masten v. State of New York (11 A D 2d 370, affd. 9 N Y 2d 796, supra). However, Mr. Palmer, the State’s witness, stated he considered the probability of such a change somewhat remote.
We have given consideration to the testimony of both the claimant’s witnesses and the State’s witness Palmer with reference to the Washington Avenue frontage, and we find that there was a definite trend toward commercial development. The evi *139 dence of instances of zoning changes to commercial or industrial in the vicinity supports a finding that the probability of a zoning change of this property to commercial existed at the time of the appropriation. Such probability had a decisive effect upon the selling price, and a buyer would pay a premium for such probability in addition to what the property was worth under the restrictions of the existing ordinance. However, we do not consider such probability of rezoning as great as that on Western Avenue. Under all of the evidence we find that the probability of a zoning change was greater than the State’s witness Palmer contemplated, and we have placed a per-front-foot value on this property accordingly.
We find that at the time of the appropriation the Washington Avenue frontage had a value of $350 per front foot for a total value of $802,900, from which we have deducted the sum of $53,952.50 the cost of relocating the three holes, to arrive at a value of $748,947.50 for this Washington Avenue frontage.
We find that the Fuller Road frontage was suitable for residential development and it will be considered together with the residential land.
Upon the trial the claimant introduced a plan for maximum utilization of its property. We regard this plan as feasible and have given consideration to it in arriving at our award herein. One whose land is appropriated is entitled to receive the greatest value for any available use to which it may be put (Matter of City of Rochester (Smith St. Bridge], 234 App. Div. 583, 586) and he is not limited to the use he made of his property at the time of the appropriation (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37).
Of the 292.5 acres comprising the claimant’s property, the plan for commercial utilization of the Western and Washington Avenues frontages would require approximately 24.3 acres, leaving a total of 268.2 acres. Approximately 170 acres were devoted to the golf course and the other club facilities, leaving approximately 98 acres available for development as residential area.
Considerable expert testimony as well as numerous sales were introduced in evidence to show the value of the claimant’s land for residential use. It would serve no purpose to review such testimony and sales herein. We have considered this evidence and find there was a great demand in the Albany area at the time of the appropriation for land suitable for residential development, particularly in the western part of the city, and that the Albany Country Club tract was unique in many ways and well suited to such purpose, and upon the whole record we find that *140 98 acres of the tract available were for residential development and were worth $6,000 per acre at the time of the appropriation, for a total value of $588,000.
We now proceed to a discussion of that part of the tract devoted to the activities of the country club. We may begin the appraisal of this segment of the claimant’s premises by observing that country clubs are in the same category as country churches in the sense that people do not usually go around buying and selling them (Matter of Simmons, 127 N. Y. S. 940) and with this thought in mind we will employ herein the summation method of appraisal generally applied to such properties (cf. Harvey School v. State of New York, 14 Misc 2d 924).
The claimant seeks to be paid for the club land at its market value for residential purposes, for the replacement value of the club buildings and appurtenances, for the replacement value of the golf course and irrigation system, and other structures appurtenant thereto, for the replacement value of the trees, and the replacement value of the present water supply system at another and newer location.
The liability of the State is not to furnish the claimant with equivalent facilities at a new site, but to pay just compensation for the land and improvements thereon (Abe Cooper-Syracuse v. State of New York, 8 A D 2d 578, 579, affd. 6 N Y 2d 964).
The authorities relied upon by the claimant in its brief as support for the proposition that it is entitled to the cost of equivalent facilities at a new site (such as Knollwood Real Estate v. State of New York, 33 Misc 2d 428; Sinclair Refining Co. v. State of New York, 279 App. Div. 629; Muncy v. State of New York, 11 Misc 2d 829) involved situations where only a partial taking was had and where the claimant incurred expenses constructing equivalent or alternate facilities so that it could continue to utilize the same site, and thereby having the over-all effect of mitigating damages. The present case involves an entire taking, and is distinguishable. Moreover the evidence herein enables us to make proper findings with respect to the cost of the improvements located on the site; therefore we have given no consideration to the cost of construction of the golf course or the water supply facilities at the new site. The motions made by the defendant to strike out such costs, upon which decision was reserved, thus become academic.
We find that as of the date of the appropriation the clubhouse complex had a sound value of $389,035.
In arriving at this figure we have relied primarily upon the appraisals of Mr. Palmer and Mr. Tull. We also have included the bridges located on the golf course in this appraisal, and have not considered them in our valuation of the golf course proper.
*141 We have also eliminated the superintendent’s residence, and bathhouse at the lake, since these structures were located within the area to be utilized for residential purposes, and have given them consideration in our valuation of such tract, but only to the extent they would enhance such tract. The water mains we have considered as part of the water supply equipment.
We find that as of the date of the appropriation the golf course proper, excluding trees and water supply had a replacement value of $292,720.
We have given consideration to the replacement costs of the course at the old site given by both Mr. Tull and Mr. Jones.
The main difference between these gentlemen was the valuation of the greens and tees and of the post-construction maintenance. We find Mr. Jones’ estimate of the costs of the greens and tees to be the more realistic, but his figure of $7,000 for the drainage was quite high, considering his testimony to the effect that he found very few places where there appeared to be any drainage because the drainage is natural drainage.
As indicated (supra), we have valued the bridges with the clubhouse complex. We also regard Mr. Jones ’ post-construction maintenance cost of $55,000 as rather high. Since the Albany area is not usually subject to the violent storms encountered in tropical and seacoast areas, the likelihood of extensive damage by the elements entailing so large an expenditure before the course stabilizes is not too probable, and we have revised this figure downward accordingly. We have made several other revisions of the figures based upon our study of the estimates of both of these experts.
We have accepted the appraisal of Mr. Fraser with respect to water supply replacement at the old site. He differed with Mr. Tull primarily with respect to the reservoir dam. Mr. Tull’s estimates are based on the use of nonunion labor, and his knowledge of the construction of the dam was somewhat superficial. He did not know that the dam had a core wall, but admitted that one may be required and such item would increase the cost of the dam.
We find at the time of the appropriation the sound value of the water supply equipment was $45,319, which sum includes the water mains.
Claimant seeks the sum of $614,000 as replacement value for the trees located on the golf course and the clubhouse complex. As we have already indicated these trees had an aesthetic as well as a practical value in their various locations on the club property. However, we will consider the value of such trees as part *142 of the land devoted to club purposes, and value them together with such land as enhancements thereof (Comstock Foods v. State of New York, 18 Misc 2d 519, affd. 11 A D 2d 753; Mitchell v. State of New York, 20 Misc 2d 374; Ribak v. State of New York, 38 N. Y. S. 2d 869).
We now proceed to a consideration of the approximately 170 acres of land devoted to the activities of the club. The method of appraising this particular tract is one of the controversial issues of this claim. It is the contention of the claimant that it is entitled to receive compensation for the value of this property as residential property plus the value of all improvements located thereon, including the trees, even though such improvements were not adaptable or suitable for residential development.
According to the comparable sales and the value estimates given by the experts it would not be economically feasible for any developer to pay six or even seven thousand dollars per acre for the raw acreage, and then pay in addition thereto the sound value of all the improvements located thereon, as well as an additional sum for the enhancement of the land by the trees, then demolish most of the structures since they could not be utilized when the tract was subdivided for residential development. However, the claimant seeks an award based upon such a valuation.
The State, on the other hand, contends that the market value of the property should be the criterion, and in the present case, if the land is to be valued for residential purposes, the value of the improvements under the circumstances herein is merely nominal, and only when the land is to be valued as club purpose land may the court consider the value of the improvements.
The New York State Constitution (art. I, § 7) commands that just compensation be paid an owner whose property is taken by the exercise of eminent domain. ‘ The constitution and statutes do not define the meaning of just compensation. But it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called < market value.’ It is recognized that an owner often receives less than the value of the property to him but experience has shown that the rule is reasonably satisfactory.” (Petty Motor Co. v. United States, 327 U. S. 372.) Generally, market value is the criterion for the ascertainment of what constitutes just compensation.
Nichols, Eminent Domain (3d ed., vol. 4, § 12.1, pp. 17, 18) points out: “ So long as there is an ascertainable market the market value doctrine is adhered to. * * * Where, however. *143 the character of the property is such as not to be susceptible to the application of the doctrine of market value the Courts have based their awards on a so-called actual or intrinsic value. Resort has been had in such cases to the current cost of reproduction less depreciation.”
In the present claim we have found the replacement value of the various structures. We note, however, that both of the claimant’s expert witnesses, as well as Mr. Palmer, who appeared for the defendant, in making their appraisals were able to place a fair market value on the acreage devoted to club purposes.
Mr. Murphy, who appeared in behalf of the claimant valued the acreage devoted to club purposes at $3,000 an acre. Mr. Van Winkle also appraising for the claimant appraised such acreage at $2,500 an acre. These figures did not include the trees nor a consideration of the availability of the water from the lake for irrigation purposes. Mr. Palmer placed a value of $3,000 an acre on the same tract. However, he included landscaping, trees and the proximity of the club to the city, its accessibility to the highway and public utilities, as well as an excellent water supply and the type of soil underlying the course. He cited two comparable sales where raw acreage was purchased for intended use as a golf course. One property brought a price of $844 per acre, and the other $731 per acre. However, both of these properties were more remote from the City of Albany and lacked the various facilities of accessibility, water supply and landscaping found on the claimant’s site. Accordingly, Mr. Palmer revised his appraisal of the subject site upward to reflect such advantages. On the other hand, the appraisals given by Mr. Murphy and Mr. Van Winkle did not include the trees nor the water supply. In arriving at our valuation we have considered the testimony of these three gentlemen, and we have also considered the value of the trees and the excellence of the water supply, which were not adequately considered by Mr. Palmer and have determined a value of the land devoted to club purposes, at the time of the appropriation of $5,000 per acre, for a total value of $850,000.
In arriving at our determination of the value of the land devoted to club purposes we have not considered the sale or the contract to sell the Oolonie Country Club to Sears-Roebuck. The sale of the property of the Colonie Country Club was made to Sears-Roebuck for a regional shopping center, and was located in an area which was rapidly becoming entirely devoted to such commercial enterprises, while commercial development in the area of the Albany Country Club was limited to strip development on Western and Washington Avenues. There is nothing *144 in the record to indicate that the best available use of the acreage of the Albany Country Club was for a regional shopping center, and, therefore, we have given no consideration to this sale.
Claimant also seeks so-called special damages, which we will now consider:
1. The claimant is not entitled to the reasonable cost of moving its property to a new site (Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583, 587, supra). We know of no authority which would support an award for this item. The recent amendment to the Education Law (§ 307) providing for reasonable and necessary moving expenses not in excess of $300 where property is appropriated for education purposes, is applicable only to an individual resident, owner or tenant moving his household items or equipment to a new residence. Defendant’s motion to strike out testimony regarding moving costs, upon which decision was reserved, thus becomes academic.
2. The apportionment of taxes and sewer assessments. Despite the amendment to section 17-a of the Condemnation Law effected by chapter 985 of the Laws of 1962, there is no provision under the pertinent appropriation statutes permitting these charges to be prorated and allowed as part of an award herein, and therefore we cannot consider these items.
3. The cost of occupancy subsequent to the appropriation. We have not considered this item. The State and the club entered into an agreement whereby the club was to pay rent of $7,000 a month for continued use of its present facilities. The club seeks an amount equal to the rent it has paid and will continue to pay under this agreement until it vacates the club premises. Upon the date of the appropriation the State was entitled to the use and occupancy of the premises and the claimant was entitled to receive compensation for the value of such premises. When such compensation was not paid coincidently with the taking of the property, it must include some sum in addition to the bare value of the property at the time of the taking, for the delay in making payment, so that the compensation may be just. Without the addition of some sum the requirement of just compensation, constitutionally guaranteed, would not be met. In the absence of evidence as to what such additional sum should be, interest, as provided by law, meets the constitutional requirement (Matter of City of New York [Bronx Riv. Pkwy.], 284 N. Y. 48).
Where the claimant can show that the parcel taken is rentable at a rate fairly and reasonably greater than legal interest, he may recover that amount, although as we have stated, in the absence of evidence to the contrary, legal interest is ordinarily *145 the measure of damages (Smith Corp. v. State of New York, 31 Misc 2d 107).
We know of no authority entitling claimant to both the interest and the rental value of the premises or equivalent facilities until it finds or builds another site, and there is no proof before us that the rental value exceeds the interest rate. The whole duty of the State herein is to pay the claimant the value of the property taken, and interest upon the amount of such compensation until payment is actually made. If the claimant and the State see fit to enter into an agreement for the payment of rent by the claimant for its continuing use of the property appropriated, such agreement is not of any concern of this court under the circumstances herein. Furthermore, we do not regard this agreement as particularly novel or strange (cf. Glen & Mohawk Milk Assn. v. State of New York, 207 Misc. 1130, affd. 2 A D 2d 95, where a similar agreement was entered into by the owner of the property with the State for continued use of its former facilities).
Upon the trial claimant had introduced evidence of the cost of maintaining its stall until it moves to its new facilities. This is not a proper element of damages for our consideration herein. Defendant’s motion to strike out testimony with regard to this item, upon which decision was reserved thus becomes academic.
During the trial a motion to amend the claim to increase the amount demanded to $5,280,000 was granted.
Upon all of the evidence we find that as a result of the appropriation of its property by the State of New York, claimant has been damaged in the sum of $3,079,646.50 and is entitled to an award against the State of New York in such sum with interest thereon from January 3,1961 to July 3, 1961 and from July 26, 1961 to the date of entry of judgment herein.