John P. Cohalan, Jr., J.
This is a condemnation proceeding conducted pursuant to the Suffolk County Improvement Act (L. 1927, ch. 190, as amd).
The county has acquired the land for park and recreational purposes. The taking is a complete one, and includes fixtures and personal property.
For about seven years immediately prior to the vesting date on December 2, 1970, the premises were operated by the claimant domestic corporation as a profit-making venture, which included the operation of a clubhouse, an 18-hole golf course, an outdoor swimming pool, two marinas for mooring and servicing boats, a riding stable, three tennis courts, and dining and catering facilities for members and outside organizations. The court has viewed the property on several occasions.
The appropriated property lies in the hamlet of Great River, in the Town of Islip, in Suffolk County. It consists of 230.315 acres overall, 19.538 of which are underwater; 12.2 acres of the underwater land are in the Great South Bay and are geographically in Brookhaven Town. They immediately front the upland. Record title is in Timber Point Country Club, Inc. Approximately one-sixth acre of the total land (in the southwestern portion of the premises) is claimed to be in other ownership, but we shall speak throughout as if there is only one claimant.
*234 The parcel is bounded on the north by Biver Boad, a town highway, on the northwest by South Street, also a town road, on the east by a State conservation preserve and by the Connetquot Biver, on the south by the Great South Bay, and on the west by a creek or canal on the far side of which is the Heckscher State Park, and by the park itself. It has a street frontage of approximately 600 feet on the town roads and some 6,700 feet of waterfront. The nearest major artery of traffic is the Montauk Highway (State Boute 27-A), one and one-half miles to the north. It runs east and west.
The upland is generally flat, ranging in elevation from marshland to a maximum of about eight feet above sea level. One hundred forty acres embrace the golf course; the remainder-is devoted to clubhouse activities and the uses, other than boating, enumerated above.
Entrance to the site is by way of a two-lane oiled dirt road leading from the town highway, and lined on either side with trees to the aggregate number of about one hundred. The main road leads to the clubhouse, and dirt paths fan out to separate forks for the marinas and the stables and the swimming_pool complex. The aggregate award demanded by claimant totals $8,500,000; the offer by the county is $2,400,000 (both figures rounded).
According to the claimant the highest and best use (HBU) of the premises would be represented by the 18-hole course, the continuance of the marinas, plus small areas of clustered single-family and multi-family dwelling units.
The county version of the HBU is that the interim use found on the vesting date was desirable until such time as the property could be developed into some form of cluster housing which would retain the golf course and the marinas for the use by and enjoyment of the residents on the property.
Both sides segmented the premises into its component parts, taking their cue apparently from Albany Country Club v. State of New York (37 Misc 2d 134, mod. 19' A D 2d 19%-affd. 13 N Y 2d 1085). This court wall proceed in the same way and will break dowui the items as nearly as possible in the manner adopted by the parties, using the summation approach.
The zoning classification is AAA which, inter alia, permits single-family residences on a one-acre plot of 40,000 square feet. However, in 11 cases ranging from 1964 to 1969, the town fathers permitted cluster zoning on a density formula allowed under AA one-half acre of 20,000 square feet, pursuant to section 281 of the Town Law — of which more hereafter. The zoning in the vicinity within one-half mile is either AAA or AA.
*235 The use as a golf course constituted a nonconforming one. Until a few years before the condemnation it was a proper use, but became nonconforming in 1964 when it was placed in a Recreation Service G-. District which permits ‘‘ a golf course with attendant facilities including a clubhouse, whether or not conducted for gain or profit ”.
THE CLUBHOUSE
The main clubhouse is a three-story frame building of bastard colonial design, erected originally as a private residence in the eighteen nineties or in the first decade of the twentieth century. Though itself set among trees, it overlooks to the south several of the greens, tees and fairways of the golf course, which are only sparsely provided with trees or foliage. Despite this lack it presents a panoramic view where every prospect pleases.
Bearing in mind its original purpose, the first floor has, nevertheless, been well adapted to clubhouse use by extensive renovations over the years. It contains a large modern kitchen, a spacious dining room and dance floor and a bar and cocktail lounge. On the bay side a large open patio or terrace is available for dining and dancing use in good weather.
The basement or cellar leaves much to be desired. It has drainage which does not drain properly, loose electric wires, a walk-in refrigerator partially supporting the floor above, signs of termite infestation and generally shows definite indications of having been neglected during the claimant’s occupancy.
Both the first and second floor have separate locker rooms, shower and toilet facilities for men and women. In addition, the second floor contains 12 bedrooms and 9r baths, some of the latter serving 2 bedrooms and some for common use. While functional in the literal sense, the sleeping accommodations are obsolete in this demanding era of a bath for each bedroom unit.
The third floor is also devoted to sleeping quarters, some adapted for guests and the remainder for the sleep-in help. On both floors the halls are narrow, the walls are in need of paint, the ceilings are not in prime condition. The over-all picture could not be described as luxurious.
The square footage of the entire building totals about 34,000. In his calculations the county’s appraiser estimated that a 20,000-square-foot building of modern design would serve to duplicate the current facilities. This .raises the question as to whether the building should be figured at reproduction cost (duplication) or replacement cost — equal in utilization, but with a modern and functional design. In either case depreciation must be considered.
*236 To reproduce the building would be as anachronistic as introducing a late Victorian culture into a hippie commune. The replacement approach is therefore adopted. At the same time the arbitrary reduction of the square footage and the accompanying argument that it will duplicate the current facilities in their entirety is received with justifiable skepticism. In the court’s view the reasonable cost of duplicating the functional features of the clubhouse, based on 34,000- square feet and on the testimony adduced, would be $680,000, depreciated by 60%, for a net replacement cost of $272,000.
The foregoing discussion did not take into consideration the plumbing, heating and ventilating and the electricity and the air condition units. As to them there is a wide disparity of appraisal between the adversaries. The county would allow salvage value only to the tune of $23,810; claimant values the lot at the sound value (after depreciation) of $119,219.32. The court awards $103,000 for these items, predicated on a net rehabilitation cost as postulated by petitioner, less a 60% depreciation.
In summary the award for the clubhouse in its entirety is $272,000, plus $103,000, for a total of $375,000 as depreciated. This includes all profits and fees.
THE GOLF COURSE
In or about the year 1923 a golf links designer named Alison, was retained to lay out an 18-hole course at Timber Point.
An exhibit in evidence indicates that 373,740 cubic yards of fill were dredged from the Great South Bay and deposited where needed on the incipient course. This amount contrasts with the Robert Trent Jones, Inc. estimated figure of 466,000 cubic yards. Inasmuch as we are dealing with actualities and with precision in presumed course reproduction, the lesser figure is accepted in the absence of other proof.
The claimant’s cost estimate of $3 per cubic yard is met by the county’s of 80 cents per unit. The court is satisfied that the $3 item represents certain difficult factors, such as distance of dredging and transportation, which contributed to the higher figure. However, to the county estimate an additional 50 cents per cubic yard has been added to provide for spreading the fill, filling in the features such as tees, bunkers, greens and fairway mounds, and for trap sand, to reach the aggregate of $1.30 per cubic yard.
The contending parties were in substantial agreement as to the initial cost of establishing greens ($150,000) tees ($19,000) fairway and rough, including bunkers ($100,000) and irrigation
*237 ($70,000). As to clearing, the cost is set at $15,000; as to drainage the court sets the amount at $100,000 minus $25,000 for depreciation; and for post-construction maintenance the sum of $60,000.
Thus, in recapitulation the golf course reproduction cost is:
1. Fill, including earthmoving and feature fill____ $485,862.00
2. Clearing .................................. 15,000.00
3. Greens .................................... 150,000.00
4. Tees (including practice tee)................ 19,000.00
5. Fairways, roughs and bunkers............... 100,000.00
6. Irrigation (manual) ........................ 70,000.00
7. Drainage.................................. 75,000.00
8. Post construction maintenance............... 60,000.00
$974,862.00
plus 10% architect fee.................. 97,486.20
$1,072,348.20
In passing it should be noted that in its complete report on behalf of the claimant, the corporate golf course designer wrote glowingly of the physical properties of Timber Point. Yet only three years before (Nov. 1967) it had written slightingly of them when it noted in a feasibility report with respect to property about 15 miles to the east that ‘ ‘ the club on the south shore (Timber Point) does not constitute a competitive factor to the (study) project because of severely inadequate clubhouse facilities and generally poor maintenance ”. (Matter in parentheses supplied.)
LAND VALUE
Claimant contends the value of the acreage is $4,000,000 or roughly $17,400 per acre. This contrasts with petitioner’s valuation of $1,716,000 averaging $7,460 per acre.
Each side has attempted to locate comparable sales which, properly adjusted for time, size, facilities and location, would indicate a fair valuation of Timber Point. The project is definitely a specialty. It is difficult to compare it with anything else. Nothing in Suffolk has all the facilities that the appropriated property has to offer. One would have to travel far afield to find a similar spread as ideally adapted to the sportsmen’s purpose. While recognizing the principle that it is the loss to the condemnee rather than the gain to the taker that controls in a proceeding such as this (St. Agnes Cemetery v. State *238 of New York 3 N Y 2d 37, 41) any attempt to employ comparables is like using a superlative for the word 1 ‘ unique
As an example, claimant’s comparables include plots of one or two acres. The court does not accept the enthymeme that a one-acre parcel — however adjusted — represents in value l/230th of the value of the total acreage. No valid argument has been presented to justify a departure from the general rule that the larger the mass the lesser its value as contrasted with the value of its individual parts.
On the other hand, petitioner has submitted as comparables some large acreage parcels neither near nor contiguous to water, be it bay, sound, lake or stream. But the attempts to “ adjust ” under such conditions are more convincing than the gambit of comparing 1 acre to 230.
Both sides submitted golf course comparables. Three of the four submitted by petitioner are in Nassau County where the population density is much more concentrated, and land values generally higher as a result. The fourth, in Suffolk, is in the middle of the island and does not match the subject in the various amenities.
Claimant’s three “comparables” golf courses are also far removed from Great Biver, and, lacking the same facilities, can hardly form a fair comparison to the Timber Point property.
The nearest approach to a comparable “ comparable ”, in the court’s opinion, is the property at Gardiner Manor in Bay Shore, but because it itself is under condemnation by the same government agency the court hesitates to consider it, due to the possibility of prejudging its value in a collateral proceeding. Suffice it to say that it has 3,000- foot frontage on Montauk Highway and 2,800 feet on the Great South Bay and covers 231 acres of land, one third of which is marshland. It sold between private parties for $1,404,000 in 1969 for an average per acre price of $6,080.
Be that as it may, however, the court has given consideration to all the comparables to the extent it deems them or any of them of any assistance in arriving at its value award for the land appropriated.
As a value factor the trees on the premises must necessarily enter into the equation. Claimant has appraised 1,388 trees to be worth $831,800, which works out to just about $600 per tree.
While any reasonable person would be prepared to concede that 210 acres of land completely devoid of trees would be an arid wasteland, the county should not be asked to pay for the trees as a separate item superimposed on the replacement cost of the golf course and the market value of the acreage.
*239 Claimant’s arboriculturist conceded that “ at least 50% of the trees were placed by the proprietor ” which means that the other half were brought there by nature’s prevailing winds, by the flight of passing birds, or like Topsy, “ jest growed With very few exceptions, perhaps 15 or 20 in number, the trees are neither ornamental nor decorative, but rather functional as fairway dividers, as eye relief, and as windbreaks.
The trees are by no means evenly spaced. Disproportionately large numbers of them are concentrated in the northwestern portion of the premises, whereas, as noted, there are correspondingly few on the back nine of the golf course.
The court has given consideration to the value of the trees to the extent only that they enhance the value of the land. (Albany Country Club v. State of New York, supra; Cross v. State of New York, 37 A D 2d 687 [4th Dept.]; Duksa v. State of New York, 34 AD 2d 1053 [3d Dept.].)
The land (including trees) award is $2,042,500, represented by 165 acres of upland at $10,500 per acre ($1,732,500), 45 acres of lowland at $6,000 per acre ($270,000), and the 20 acres underwater at $2,000 a piece ($40,000). Included in both the upland and lowland areas and as acreage enhancement, $500 per acre has been allocated for trees and foliage. If separately appraised the flora would come to $105,000 under the formula.
THE WEST MARINA
The west marina is actually a 775-foot bulkheaded area capable of mooring — stern to- — 76 boats less than 26 feet in length. It is equipped with water and with electrical outlets. Pilings for mooring purposes have been set about 10 feet apart. A ramp to haul and launch boats is also included.
The parties were in accord that the value of the item is $55,000 prior to depreciation. The court adopts a one-third depreciation and sets a value of $37,000 (rounded).
THE EAST MARINA
This marina is a much more sophisticated venture than its companion to the west. Although it has some bulkheading, the mass of the improvement is concentrated in a timber dock about 900 feet long, 140 of it 5 feet wide and the remainder 8. It can berth 80 boats exceeding 26 feet in length. It also has 36 finger piers for boarding the vessels alongside.
Por servicing the boats there are dockside electric and water service and a nearby auxiliary building which includes toilet facilities and showers for both sexes.
Oak mooring piles separate the individual slips.
*240 Petitioner estimated reproduction cost to be $74,298 and depreciated it 70% because of alleged untreated timber. Claimant’s appraiser estimated a reproduction cost of $204,332, depreciated one third to $136,221. The court awards a gross of $158,834, less one-third depreciation, for a net sum of $105,890. In addition the auxiliary building (comfort station) is evaluated at $5,000.
POOL AREA
This area encompasses a bathhouse and pool pavilion building, a kiddie wading pool and an adult swimming pool, a pool filter and pump building, and 145 attached individual bathhouses, euphemistically termed cabanas.
The items were in operable condition on the appropriation date. From the testimony adduced, claimant’s appraiser indicated a sound value of the items in the aggregate to be $107,890, depreciated 45% from a cost of $196,194. Petitioner’s trial expert (Olson) was less than generous in ascribing a cost of $151,560 depreciated 80% to a value of only $29,258. The latter took a depreciation on each item; the claimant’s depreciation was a percentage of the gross.
However, the county’s real estate expert (Bonati), the person who co-ordinated all the other appraisers as a kind of wrapup man, reached an initial cost figure of $195,132, almost identical with that of claimant. He depreciated the area 40% as against 45% by claimant. The court will therefore accept the condemnee’s figure and set the award for this item — or series of items — at $107,890.
GREENSKEEPER’S RESIDENCE
This is a two-story frame building covering 1,100 square feet at ground level, and 1,600 over all. It contains a living room, dining area, kitchen, three bedrooms, a screened in porch and two baths. It is in generally poor condition.
The cost to reproduce it is $25,800. Allowing 60% depreciation, the court awards $10,320 for the building.
MISCELLANEOUS SATELLITE BUILDINGS
Dotted around the grounds are sundry miscellaneous buildings. They include (1) “hot dog” stand, (2) golf cart storage and lean-to shed, (3) garage and storage buildings, (4) stable and barn buildings, and (5) a pump house.
Claimant lumps their sound value at $21,091.
Petitioner has broken them down by cost minus depreciation, neglecting (1) valued at $500 by claimant; (2) is assigned a cost of $20,400 (including $2,000 for lean-to-shed) reduced by depre *241 elation to $900 ; (3) from $8,800 down to $1,700; and (4) reduced from $60,800 to $5,800. No value is assigned to the pump house as such as against $250 sound value ascribed to it by claimant.
To the court the estimates of value as outlined by claimant are more persuasive than those of the county; hence the figure of $21,091 is adopted in toto.
ON SITE IMPROVEMENTS
These items consist of grading and shaping the roads and paths now on the site and other items below. As previously noted, the best road was one of oil-on-dirt construction; the others were dirt paths wide enough for one automobile lane.
The fencing on the site included about 1,600 linear feet of wire and 100 of stockade fence.
Added to these features are three tennis courts, a water line (3,300 linear feet) and electric poles and wiring.
The claimant lists $83,663 as the cost of reproducing the above items, depreciated by $29,283, and arrives at a sound value of $54,380.
The court fixes the sound value of the several items at $30,959.92 with roads at $6,666.67, fencing $4,650, tennis and handball courts $5,575, water and electric supply service $10,030, plus 15% on all items or $4,038.25 to cover fees and profits, for the total indicated.
FIXTURES AND PERSONAL PROPERTY
Petitioner’s expert (Pratt) prepared an exhaustive report of the items he inspected and appraised. His trial testimony bore out his report. His dollar findings exceeded those of the appraiser called by the claimant.
Accordingly, the court finds that the fixtures, as depreciated, had a value of $41,030 and the personal property of $29,270, for a total of $70,300.
Many other items of personal property do not form part of the Pratt appraisal. By separate agreement the county paid $40,000 to the claimant for enumerated items as to which it received a bill of sale.
The $40,000 consideration does not form part of the award in this decision.
CLUSTER ZONING
The theme of section 281 of the Town Law is “to enable and encourage flexibility of design and development of land in such a manner as to promote the most appropriate use of land, to facilitate the adequate and economical provision of streets and utilities, and to preserve the natural and scenic qualities of open *242 lands ’ ’. It can be employed only with respect to residential zoning and may be invoked, as it has been in Islip Town, by the Planning Board in approving a subdivision plat. The practical effect of the section is that, instead of spreading so many dwelling units over so many acres of land, they could be clustered in a much smaller area, leaving the remainder of the acreage as open space. It is a form of planned unit development (PUD).
Islip, however, frowns on a separation of the cluster even though subdivision (c) of section 281, as amended, states in part that 1 ‘ the dwelling units permitted may be, at the discretion of the planning board and subject to the conditions set forth by the town board, in detached, semi-detached, attached, or multistory structures ”.
In each of the 11 cluster zonings it granted, the Islip authorities as a quid pro quo asked for and received a donation of land from the developer for various purposes. Since, however, the highest and best use as substantially agreed upon by the adversary parties would include both cluster zoning And the green belt atmosphere as reflected by the continuance of the golf course, plus the proximity of the State Park and the State Conservation areas, the probability of the town seeking acreage for the change appears rather slender. For among other considerations, any donated land would be taken off the tax rolls in a district already heavily burdened with tax-exempt properties.
Claimant projected 230 cluster units, the county 184. Two hundred thirty would of necessity include the underwater land as potentially buildable, which is forbidden under the Brook-haven and Islip Town Zoning Ordinances. Also, so much of the land is less than six feet above sea level — the minimum required by the local ordinance — that great care would have to be exercised to build only at the higher elevations to obviate the increased costs that would accompany a fill operation of such magnitude.
Cluster zoning as an incident to the filing of a subdivision map does not require a change of zone as such, due to the provisions of section 281 (supra). If we apply the analogy of a reasonable probability of a change of zone as enunciated in Masten v. State of New York (11 A D 2d 370, affd. 9 N Y 2d 796) to the instant factual situation, it would appear that the Town Planning Board would permit cluster zoning to the maximum extent of not more than 184 units concentrated within 3 or 4 acres surrounded by open space, including parking areas.
Assuming that 184 units would be permitted, this would necessarily limit the total number of moorings or boat slips at the *243 two marinas to that aggregate sum. The reason is that, since the property is in an AAA district, the residents alone would have access to and the enjoyment of the boating facilities. This would dispose of the claimant’s position that the east marina could be so enlarged as to accommodate some 500 moorings.
Of the 210 acres of upland, 140 are devoted to golf course use. The cluster zoning, as part of the highest and best use, would be confined to the remaining 70. As we have already noted, the experience in Islip has been to allow only one cluster to an applicant, and that 3 or 4 acres could accommodate 184 units.
To accomplish the cluster project would require the preparation and acceptance of a subdivision map, presumably inclusive of all the Timber Point upland acreage. No additional work for the subdivision would be needed on the golf course. However, a great amount of preliminary engineering detail would be required. Also, existing paths would have to be improved to town specification; sumps installed; additional borings to ascertain the weight bearing capacity of the land for the 184 units and various other items to comply with mapping and building requirements.
As to the 70 acres, our set of facts resembles those in Hewitt v. State of New York (18 A D 2d 1128), where the Appellate Division, Fourth Department, stated that: ‘1 There is no question but that the land involved is in a residential zone and that its best and highest use at the time was as a potential real estate subdivision. * * * The State appraised the land as raw
acreage and the claimants appraised it as though it had been subdivided at the time of taking. Actually it had not been so subdivided; no map had been filed and no lots offered for sale. Some preliminary plans had been prepared but had not been acted upon. The court below determined the value of the tract by computing the total market value of the proposed lots in the hypothetical subdivision suggested by the claimants. The court found a value of $3,500 per lot and then deducted the estimated cost of development of this hypothetical subdivision. This method of valuation was highly speculative and improper. The correct rule to be applied under the existing conditions was to treat the premises not as raw acreage nor as part of a completed development but as a potential subdivision site giving the acreage an increment in value because of that potential use.”
In reliance on the appellate court’s rationale, we determine the increment in value based on the potential use to be $2,500 per acre for the 70 acres involved. This adds up to $175,000, *244 which the court awards for this portion of the condemnation proceeding.
As we know, the offer by the county to acquire Timber Point was $2,400,000. To show a greater value claimants put in evidence a page of the county’s capital budget for the year 1971 which indicated that the county, with the anticipated assistance of the State on a fifty-fifty basis, was projecting $4,600,000 as the cost of the acquisition. Called to the stand as a witness by the claimant, the County Executive explained that in the capital budget — as opposed to the general budget — “ the lists and the monies opposite the lists are estimates ” and that to consummate any transaction the County Legislature would of necessity have to appropriate money for it. Here, as we now know, the State withdrew from the scene and the county went it alone.
To put the shoe on the other foot, the petitioner produced a record of the claimant showing “ Total fixed asets, $1,959,075 for the year 1970 ” before depreciation. This figure was a book value as carried in the claimant’s records in a “ pro forma statement of operations ” as so designated by claimant.
The court has given short shrift to both contentions as to value as represented by the county’s capital budget and the claimant’s balance sheet. Neither is persuasive on the question of market value of the premises involved.
Upon all the evidence the court finds that claimant has been damaged in the total sum of $4,053,300 (rounded from $4,053,299.12) and is entitled to an award in that amount, with interest from December 2, 1970, less any payments made by the county since the appropriation.